## IV.

### CONCLUSION

A separate order summarizing all of the above shall issue this date.

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PARKERSBURG WIRELESS LIMITED LIABILITY COMPANY, Michelle A. Gerstner, PX Marketing, Inc., Rodney Bonvicino, Madcap Services, Inc., John C. Trimpin, Infotech Group, Inc., George N. Riggle, Jr., Multistate Communications, Inc., Alternative Management, Inc., Capital Resource Management, Inc., D.R. Williams Consulting, Inc., Touch Access Technologies, Inc., and Cablefree Investments, Inc., Defendants.**

Civ. A. No. 94–1079.

United States District Court, District of Columbia.

July 29, 1994.

---

**33.** Def.'s Opp'n to United States' Motions to Quash Subpoenas at 4.

**34.** *Id.*

Bruce M. Bettigole, Stephen J. Korotash, Laura R. Singer, Yuri Zelinsky, Mary Houle, Philip J. Berkowitz, for S.E.C.

Mark S. Dzarnoski, Las Vegas, NV, for defendants Parkersburg & Michelle Gerstner.

David Greenberg, San Francisco, CA, for defendants PX Marketing, Inc., and Rodney Bonvincino.

Patrick Meyers, Moye, Giles, et al., Denver, CO, for defendants Infotech and George Riggle.

Phillip Karasyk, Deinst & Serrins, New York City, for defendant Alternative Management, Inc.

Steven Halfhill, McLean, VA, for defendant D.R. Williams Consulting, Inc.

Martin Reed, Epstein & Reed, Los Angeles, CA, for defendants Madcap Services and John Trimpin.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Before the Court is plaintiff Securities and Exchange Commission's ("the Commission") motion requesting the Court to hold defendant Michelle Gerstner in civil contempt for

failure to comply with our June 10, 1994 order requiring Gerstner to "immediately and fully identify the custodians of the transferred funds, Cobain and TransGlobal, to the Commission, so that the Commission may serve them with a copy of the TRO." After consideration of the filings on this issue and after review of the statements of counsel made at the hearing held July 26, 1994, the Court finds defendant Gerstner to be in civil contempt and requires her to supply the required information by August 15, 1994.

## I. *Background*

In this action, the Commission charges that the defendants were engaged in numerous violations of Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Commission Rule 10b–5,[1] by selling unregistered securities in Parkersburg Wireless Limited Liability Company ("PWLLC"). Defendants are also accused of committing securities fraud by promising investors exorbitant and unrealistic returns.[2] The Commission initially sought emergency relief in the form of a temporary restraining order ("TRO"). The Court issued the TRO on May 18, 1994,[3] and then granted interim relief in the form of a preliminary injunction on June 15, 1994.[4] The case presently awaits further action on the merits.

Defendant Gerstner registered PWLLC as a Nevada limited liability company in early 1994 and contracted with a number of independent sales organizations to sell PWLLC membership interests. The membership interests were never registered with the Commission as securities. Ms. Gerstner served as sole manager of PWLLC until the appointment of a receiver by this Court on July 12, 1994. While she served as manager, Gerstner signed a contract on behalf of PWLLC with UniMic & Associates ("UniMic") under which UniMic was purportedly to develop marketing materials for PWLLC. In return, UniMic was to receive 4% and later 6% of all investor funds. Gerstner admits that she owns 100% of UniMic. Gerstner deposition, p. 32.

The question of contempt stems from the Commission's attempt during Gerstner's deposition on June 3, 1994, to determine the financial status of UniMic as reflected in the following colloquy:

Q. So what I'm asking is other than the less than $100,000 that UniMic loaned to ServPro[5] and the approximately $195,000 that UniMic has paid out for various expenses, are there other sums that UniMic has paid for any reasons?

A. There was 260,000.

Q. Who was that paid to?

A. That was paid to an individual to secure markets.

Q. Who was that?

A. I believe that was to TransGlobal in New York.

Q. And which market was that paid to secure?

A. This fee that they charged me was to, number one, help me find markets and then put option money down on a specific market, but he's been working with that sum to secure other markets.

\* \* \* \* \* \*

Q. Who have you been dealing with at TransGlobal?

A. Richard, and I don't remember his— how you spell his last name, but it's something like Cobain, C-o-b-a-e-n or C-o-b-a-i-n.

Q. And how did you know him or how do you know him?

---

1. 15 U.S.C. §§ 77e(a, c), 77q(a), 78j(b) and 17 C.F.R. § 240.10b.5.

2. Certain of the defendants were also charged with being unregistered broker-dealers.

3. Among its provisions, the TRO froze the assets of all defendants and required each defendant to provide a sworn accounting of all assets including assets in which any defendant had a direct or indirect beneficial interest. TRO, §§ V, VI.

4. During the motions hearing on the preliminary injunction defendants conceded that the Commission had established a *prima facie* showing that violations of the securities laws had occurred.

5. Gerstner owns 95% of ServPro, with the remaining 5% owned by her 20 year old nephew.

A. I came across him when I'd been looking for markets. Somebody said you could ask people for names..

Q. What kind of company is TransGlobal?

A. They look for wireless cable markets, although I don't believe that it's just exclusive of wireless cable.

\* \* \* \* \* \*

Q. How much of the 260,000 was paid to TransGlobal, approximate?

\* \* \* \* \* \*

A. I don't—I would prefer to check before I give you a figure, and I could provide that.

\* \* \* \* \* \*

Q. Well, just to give me some kind of ballpark, you haven't paid more than $60,000 in fees to TransGlobal, have you?

A. I would be happy to verify the figures and give that to you on Monday.

\* \* \* \* \* \*

Q. When did this $260,000 get transferred to TransGlobal?

A. Perhaps as early as February [1994].

Q. And are there any written documents related to UniMic's dealings with Trans-Global?

A. No, there are not.

Q. There's no contract?

A. No, there is not.

Q. What bank account is this money held in, this $260,000?

A. I don't know.

\* \* \* \* \* \*

Q. You testified that the $260,000 was transferred to TransGlobal in approximately February '94; is that right?

[Defendant's Counsel]: Counsel, at this point I'm going to make an objection on the record, and that is the following: UniMic is not a party to the action. Insofar as your examination is involving areas of activity regarding UniMic's business apart from and unrelated to the business of [PWLLC] and any activities that UniMic performs on behalf of [PWLLC], it's irrelevant, gets into areas that we believe are confidential materials, proprietary information. The client ... will not be responding to any further such questions ...

[Commission's Counsel]: ... your client is personally subject to an asset freeze imposed by the court, and she's now testifying about investor funds that she transferred ... and those funds are clearly subject to the freeze order of the court, and it sounds to me like they're not being treated in that manner.

[Defendant's Counsel]: There's no transfer of funds, Counsel, after the date of the temporary restraining order or the asset freeze, and again it has to do with business apart from Parkersburg.

Gerstner deposition pp. 351–357. There were no more material disclosures concerning the transfer during the deposition. Defendant made no constitutional objections to the Commission's questioning regarding the transfer to TransGlobal during the course of the deposition.

The Commission requested that Gerstner reveal the correct name, address, and phone number for Cobain so that he might be served with a copy of the TRO. Successful service of the TRO would subject the $260,000 to the asset freeze. Gerstner declined to reveal this information. On June 7, 1994, the Commission filed a formal motion with the Court to compel Gerstner to reveal the information requested and to require Gerstner to recover the money and have it retransferred into a frozen account. Gerstner filed her response with the Court via facsimile on June 10, 1994.[6] In it, Gerstner stated that she had not yet had an opportunity to review the deposition transcript as permitted by Fed.R.Civ.P. 30(e), and that it would be inappropriate for the Court to grant the Commission's motion.[7] The Court granted the Commission's motion on June 10, 1994 ("June 10th order") because we were concerned about the possibility the $260,000, not then

---

**6.** A permanent copy was filed with the Clerk of the Court on June 13, 1994.

**7.** The opposition, like defendant's objections during the deposition, was grounded in non-constitutional issues. The constitutional right against self-incrimination was not raised.

subject to the asset freeze, would be further dissipated to the detriment of PWLLC investors.

Gerstner refused to comply with this order. At the hearing on the preliminary injunction, held June 14, 1994, she raised for the first time the constitutional claim that complying with the Court's order would violate her privilege against self-incrimination. The Court requested additional briefing on the Fifth Amendment issue, and continued the matter until a June 27, 1994 status call.

During the June 27th hearing, the parties argued the scope of the privilege. The Commission maintained that Gerstner had waived the privilege when she voluntarily revealed the transfer to TransGlobal during the deposition of June 3, 1994. Gerstner again requested additional time to review and edit her deposition. Turning to the merits, Gerstner posited a hypothetical. She argued that if her testimony regarding TransGlobal was in error and no such transfer had occurred, forcing her to reveal further information—which in this scenario would not exist—opened the door to a possible perjury charge as the original and corrected deposition testimony would be different. Gerstner also argued that because the purported transfer to TransGlobal preceded the TRO, the transfer was not illegal and therefore her statement was not incriminating. The Fifth Amendment is not waived if a witness' statement is not incriminating. The Commission countered that if this information was left out of the sworn accounting there is a strong possibility that she also committed perjury by omitting the transfer from her accounting.

After an additional opportunity for the parties to brief the issue, the Court entered an order on July 12, 1994, to show cause why defendant Gerstner should not be held in civil contempt for her refusal to comply with the Court's June 10th order. In response to the show cause order, Gerstner indicated that she had completed her review of the deposition testimony and that, pursuant to Rule 30(e), she had stricken the entire portion discussing the transfer to TransGlobal. Rather than give a reason for the alteration, as is required by the rule, Gerstner asserted

the privilege against self-incrimination and argued that the privilege would be violated even by complying with the rule. She suggested that the Commission should grant her immunity under 18 U.S.C. § 6001 *et seq.* before seeking to compel testimony.

The Court held a contempt hearing on July 26, 1994, at which both parties were invited to present evidence and witness testimony. Ms. Gerstner chose not to attend the hearing and did not testify. Her attorney indicated that $260,000 had been transmitted into a frozen bank account on June 9, 1994. The Commission confirmed the transfer, but could not determine the source of the funds.[8] It is entitled to this information. Consequently, the Commission believes, and the Court agrees, that the contempt issue remains vital as well as viable.

## II. *Analysis*

### A. *Standard for Civil Contempt*

 The Court may enforce compliance with its orders through the avenue of civil contempt, which involves three stages. *S.E.C. v. Current Financial Services, Inc.,* 798 F.Supp. 802, 806 (D.D.C.1992). The stages are:

> (1) issuance of an order; (2) following disobedience of that order, issuance of a conditional order finding the recalcitrant party in contempt, and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with the prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled.

*Id.* (*citing NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173 (D.C.Cir.1981). These proceedings are now at the second stage. Generally, the Court must determine by considering the facts whether there is clear and convincing evidence that recalcitrant party was aware of the terms of the order and proceeded to violate those terms. *Douglass v. First Nat'l Realty Corp.,* 543 F.2d 894, 897 (D.C.Cir. 1976). In the case at bar, however, such issues are not in dispute. If the Court concludes that defendant Gerstner improperly

---

**8.** The deposited money came from the client trust account of Gerstner's attorney.

claimed the privilege against self-incrimination, then she is in violation of the Court's order and must purge this contempt within a defined time period or bear the consequences.

### B. *Invocation of Privilege Against Self-Incrimination*

 It is left for the Court to determine the propriety of the assertion of the Fifth Amendment privilege. The privilege is generally construed broadly and must be sustained when it is

> evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... might be dangerous because injurious disclosure could result.

*Steinbrecher v. C.I.R.*, 712 F.2d 195, 198 (5th Cir.1983). If, however, the danger of self-incrimination is not apparent, the burden is on the claimant to prove that the danger exists.[9] *Id.*

 In addition, the privilege must be invoked at the time the question is asked, or it is lost by waiver. *Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409 (1984). Once the witness voluntarily raises an issue she cannot refuse to fill in the details. *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951). If the additional details further incriminate the witness, then the privilege may still be invoked as to the additional information.[10] *In re Master Key Litigation*, 507 F.2d 292, 294 (9th Cir.1974). Similarly, if the original disclosure was not incriminating, the privilege has not been waived as to related questions which might be incriminating. *Hichings v. Allegheny Pepsi–Cola*, 850 F.2d 180, 181 (4th Cir.1988). In either case the Court must "make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well founded." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir.1976).

The Court is faced with two distinct yet related Fifth Amendment questions. The first concerns the propriety of invoking the Fifth Amendment as a reason for striking deposition testimony under Rule 30(e), and the effect of such an invocation if appropriate. If defendant Gerstner can properly raise a belated Fifth Amendment claim to strike her deposition testimony concerning the transfer, then it appears to the Court that she may properly invoke the privilege with respect to additional testimony and refuse to comply with our June 10th order. If, however, defendant waived the privilege, then the Court must consider whether the additional information sought by the Commission might incriminate her further. We will deal with each question separately.

### 1. *Use of 5th Amendment as Grounds to Strike Testimony Under Rule 30(e)*

 Defendant Gerstner argues that Rule 30(e) allows her to make any substantive change she so desires. While older cases appear to support this position,[11] later cases have often limited this blank check; perhaps because of the potential for abuse. *See e.g. Greenway v. International Paper Co.*, 144 F.R.D. 322, 325 (W.D.La.1992) (Rule 30(e) may not be used to alter what has been said under oath); *Rios v. Bigler*, 847 F.Supp. 1538, 1556 (D.Kan.1994) (court will consider only those changes which clarify the deposition, and not those which materially alter it).

 Fortunately, the Court need not determine the general parameters of Rule 30(e) because it is readily apparent that the rule is geared towards correcting factual statements and not meant as a mechanism to invoke constitutional protections. The language of

---

**9.** In the present case, defendant Gerstner has not attempted to meet this burden outside of a few vague references and a hypothetical in her pleadings.

**10.** In determining whether a new question "further incriminates" defendant, the Court should not apply the same rigid test used to determine whether the privilege could be initially invoked. *E.F. Hutton & Co. v. Jupiter Development Corp.*,

91 F.R.D. 110, 116 (S.D.N.Y.1981) (*Rogers* Court intended a wider scope of inquiry to be available after waiver than was available before the waiver).

**11.** *See e.g. Allen & Co. v. Occidental Petroleum Corp.*, 49 F.R.D. 337 (S.D.N.Y.1970); *Colin v. Thompson*, 16 F.R.D. 194 (W.D.Mo.1954).

**536**

Rule 30(e) allows only for changes in "form or substance." The focus is to provide an accurate record for trial that will reduce inconsistencies. *Id.* For that reason, changes under Rule 30(e) are added to the original, and the original remains available to be used for impeachment or further clarification. *Usiak v. New York Tank Bridge Co.,* 299 F.2d 808, 810 (2nd Cir.1962).

■ The fact that the original version remains available indicates that the rule allows modification to the factual record and does not afford a second opportunity to invoke the Fifth Amendment. To hold otherwise would provide witnesses the opportunity to revise their testimony long after the deposition and redact it at precisely the moment the first inculpatory statement was made. The Fifth Amendment cannot be used after later rumination as a sword to sever incriminating statements which were voluntarily made at the time of the deposition. *U.S. v. White,* 846 F.2d 678, 690 (11th Cir.1988) ("[a] civil deponent cannot choose to answer questions with the expectation of later asserting the Fifth Amendment"); *Greenway,* 144 F.R.D. at 325 ("[a] deposition is not a take home exam"). Defendant cannot now invoke the Fifth Amendment with regard to her statement at the deposition.

■ The additional requirement for a valid waiver of the privilege is that Gerstner's initial testimony concerning the transfer must have been incriminating. Defendant argues that the statement was not inculpatory because it concerned a pre-TRO transfer. The Court, however, believes there is substantial evidence that the statement was incriminating at the time it was made. The statement was made after Gerstner signed a sworn accounting listing both her assets and those of UniMic, but omitting any mention of the $260,000 at issue.[12] This raises the specter of perjury and possible contempt if she controlled assets which were not brought within the general asset freeze. Consequent-

ly, the statement was incriminating, and Gerstner waived her Fifth Amendment right against self-incrimination when she declined to invoke it at the time she made the statement.

To properly invoke Rule 30(e), Gerstner should have provided a non-constitutional reason to strike the testimony at issue. The Court uses Gerstner's own hypothetical as an example. If her statement concerning the transfer was mistaken and incorrect, then that should have been the reason cited. If her argument is that the reason itself is incriminating, then the Fifth Amendment, if appropriate, could perhaps be used as a reason for the "correction."[13] However, the Fifth Amendment umbrella would not extend from the Rule 30(e) reason to include the testimony itself. The privilege was already waived as to the testimony. As a result, the original statement and the "corrected version" both become part of the record. *Usiak,* 299 F.2d at 810.

Because no privilege will attach to the statement itself, the Commission is free to request additional information concerning the transfer as was required by the Court's June 10th order. *Sanford v. CBS Inc.,* 594 F.Supp. 713, 715 (N.D.Ill.1984) (additional examination allowed when witness made several material changes to transcript); *Lugtig v. Thomas,* 89 F.R.D. 639, 642 (N.D.Ill.1981) (deposing attorney can reopen the examination). Rule 30(e) simply was not intended as a vehicle to accomplish what defendant seeks: purgation from the record of all references to the transfer.

### 2. Refusal to Comply with June 10th Order on Fifth Amendment Grounds

■ As a general rule, where as here defendant Gerstner waived her privilege by raising a subject, she cannot then invoke the privilege with respect to the particulars. *Rogers,* 340 U.S. at 371, 71 S.Ct. at 440. This is true unless the related questions further incriminate the witness. *In re Bon*

---

**12.** Gerstner did not assert her Fifth Amendment rights when she submitted the accounting. Therefore, the Commission was free to continue questioning her regarding both listed assets and any omitted funds.

**13.** Because this argument does not help defendant purge the statement, the Court need not address whether the Fifth Amendment can be used to avoid providing a reason for altering testimony under Rule 30(e).

*Voyage Travel Agency,* 449 F.Supp. 250, 253 (N.D.Ill.1978); *but c.f. Jupiter Development,* 91 F.R.D. at 116 (*Rogers* requires broader interpretation of waiver). The burden, however, is upon Ms. Gerstner to indicate how the additional information is incriminating. *Steinbrecher,* 712 F.2d at 198. Gerstner "must come forward with credible reasons why revealing such information presents more than a frivolous fear of [further] incrimination." *In re Connelly,* 59 B.R. 421, 434 (Bkrtcy.N.D.Ill.1986). She must supply additional statements under oath and other evidence to enable the Court to reasonably identify the nature of the criminal charge for which she fears prosecution. *In re Morganroth,* 718 F.2d 161, 167 (6th Cir.1983) (it is insufficient for claimant to make a blanket assertion of the Fifth Amendment).

Gerstner has satisfied none of these requirements either through testimony at the contempt hearing or in her briefs. The only comment by defendant even hinting at a possible criminal prosecution is the hypothetical related to perjury in the event there had been no transfer.[14] If the hypothetical were accurate and Gerstner was incorrect in her statement, the Court believes that any fear of incrimination would be frivolous. As noted by the Sixth Circuit in *Morganroth,* the risk of perjury prosecution exists every time a witness has given prior testimony. 718 F.2d at 169. Indeed, it exists every time a witness alters deposition testimony under Rule 30(e) because the discrepancy remains a part of the record. However, the perjury statute, 18 U.S.C. § 1621, criminalizes only the giving of testimony which is *known* to be false. In defendant's hypothetical the false testimony was not given intentionally, and consequently she would face no real threat of prosecution.

The Court can see no reason why the identification of TransGlobal and Richard Cobain would further incriminate Gerstner. The additional information merely provides detail to an already potentially damaging statement. No immunity from prosecution is required before the Court's June 10th order may be enforced. The Court therefore holds

that Gerstner cannot now invoke the Fifth Amendment and is in contempt of this Court's June 10th order.

## C. *Penalty for Contempt*

■■■■ The purpose of civil contempt is to force compliance with the Court's order. The normal range of penalties available to the Court is somewhat limited in this case because defendant Gerstner's assets are already frozen by the preliminary injunction. It is doubtful that monetary sanctions alone will coerce compliance. Therefore, the Court will employ a graduated system of penalties.

Initially, defendant Gerstner will be given until 5 p.m. Eastern Time, August 15, 1994, to purge her contempt and comply with the Court's June 10th order. Beginning on August 16, 1994, Gerstner will be fined $100 per day, with this sum to be deducted from the $2000 in living expenses permitted by the preliminary injunction. If she does not purge the contempt by 5 p.m. eastern time, August 31, 1994, the Court at that time will consider whether Michelle Gerstner should be incarcerated for such time as she remains in contempt of this Court.

## III. *Conclusion*

For the foregoing reasons, the Court determines that defendant Michelle Gerstner is in contempt of the Court's June 10, 1994 order requiring her to identify the custodians of certain funds transferred from UniMic. We find that she waived her constitutional privilege against self-incrimination as to her original testimony, and that she cannot invoke the privilege to avoid compliance with the Court's order because the information sought does not further incriminate her. The Court requires Gerstner to purge the contempt by 5 p.m. eastern time, August 15, 1994 or face the graduated penalties enumerated above.

An order in accordance with this opinion has been issued this date.

---

**14.** It should be noted that the potential perjury here is the danger that her second statement will conflict with the initial statement in the deposition concerning the transfer. It is not to be confused with the independent perjury issue related to Gerstner's failure to list the transferred funds in her sworn accounting.