**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**BANKERS ALLIANCE CORP.,** Carpe Diem International, Inc., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Terry Plack, Wayne Wakefield, Michael Saliba, Allan Nash, Michael Daily and John Finegan, Defendants.

No. 95–0428.

United States District Court, District of Columbia.

April 7, 1995.

Jonathan I. Golomb, Deborah Meshulam, S.E.C., Washington, DC, for plaintiff.

Stephen F. Black, Andrew B. Weissman, Wilmer, Cutler & Pickering, Washington, DC, for defendants.

## OPINION

FRIEDMAN, District Judge.

On the motion of the plaintiff Securities and Exchange Commission, the Court entered an Order to Show Cause why defendants Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Allan Nash and John Finegan (the "Bankers Alliance defendants") should not be held in civil contempt. The Court gave counsel for defendants an opportunity to file an opposition and scheduled a hearing for Wednesday, March 29, 1995. Prior to the hearing, counsel for the Bankers Alliance defendants filed a motion to reschedule the hearing and a motion for leave to withdraw as counsel.

After hearing from counsel in open court, the Court denied the motion to postpone the hearing and declined to permit counsel to withdraw in advance of the civil contempt hearing, noting that the time had not yet run for counsel's clients to set forth their position

on withdrawal pursuant to Local Rule 201(c) or for the SEC to respond to the motion. The Court then proceeded with the hearing on civil contempt. After considering the evidence presented and the arguments made by the SEC and by counsel for the Bankers Alliance defendants, the Court cites these defendants for civil contempt and directs them to purge their contempt within ten days from the date of this Opinion and accompanying Civil Contempt Order. The Court's reasons for this decision follow.

## I. FACTUAL BACKGROUND

Since at least March of 1994, defendants or their predecessors have solicited investor funds through personal contacts and through advertisements in the *Wall Street Journal* and *USA Today.* Declaration of Howard T. Carolan, Jr. ("Carolan Decl.") at ¶¶ 5, 7 and Ex. 3. The defendants have induced potential investors to invest approximately $3.7 million in $200,000 minimum investments in a program using investor funds for purportedly highly leveraged trading in foreign currencies and debentures. The defendants have projected profitability of as high as 15 percent per week, and solicitations included in the *Wall Street Journal* and *USA Today* have stated in bold print: "We will pay two times any published rate of return." Carolan Decl. ¶ 5, Exs. 1 & 3.

In its complaint and in the declaration of SEC attorney Howard T. Carolan, Jr., the SEC has described a series of allegedly misleading and inconsistent representations and claims that have been made to potential investors, including statements that Bankers Alliance is an affiliate of one of the world's largest financial institutions, that it has existed for hundreds of years when in fact it was just incorporated in 1993 and receives all of its calls through a telephone answering service, that it represents 22 trusts and holding companies, that it has funds of at least $50 million from other investors, that it controls one-fourth of the world's largest currency trading markets, and that it has been checked out with the SEC and is legitimate. Carolan Decl. at ¶¶ 13, 24, 31, 51, 63, 66, 69, 76, 81.

Potential investors have been told different stories about what the investment actually is and have been given different information as to exactly how their money will be used and what rate of return to expect. According to the SEC, Bankers Alliance has told some investors that if they invest $200,000 their returns will in fact be based on an investment amount of one million dollars, has told some investors that Bankers Alliance will double whatever return the investor is currently receiving, and has told others they will receive a return of approximately 30 percent per month. Carolan Decl. at ¶¶ 5, 8, 46, 57, 65, 83. The SEC alleges that through these activities the defendants have engaged in transactions, acts, practices and courses of business that constitute violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder.

On February 16, 1995, the Commission issued a formal order of private investigation pursuant to Section 20(a) of the Securities Act and Section 21(a) of the Securities Exchange Act and authorized designated members of the staff of the Division of Enforcement to issue subpoenas compelling witnesses to appear for testimony and to produce documents. Declaration of Jonathan I. Golomb, executed on February 28, 1995, ("Golomb Decl.") at ¶¶ 2–3, Ex. 1. A subpoena for document production was issued to Bankers Alliance and served upon defendant Roy Lee as its designated agent for service. Subpoenas requiring the appearance for testimony and production of documents were issued and served upon defendants Roy Lee and Allan Nash, among others. *Id.* at ¶ 3. All defendants served with subpoenas refused to comply. *Id.* at ¶ 4. In nearly identical letters to the SEC staff, defendants Lee and Nash asserted that they were "unaware of any activity" on the part of Bankers Alliance or themselves "which would require Securities and Exchange Commission regulation," and refused to appear for testimony. Each noted, "I will comply to any court order and/or request so described by your office." Golomb Decl., ¶ 5, Ex. 2. In response to a telephone call from the SEC, defendant Lee left a voice mail message stating that he

would not provide information absent a court order. Golomb Decl. at ¶7.

According to the SEC, there is evidence that some of the defendants discouraged investors from cooperating with the Commission's investigation. For instance, Bankers Alliance sent a telecopy instructing Bankers Alliance's investors that if they were contacted by the SEC they should contact defendant Allan Nash, who would "direct this information to the legal department for immediate action." Carolan Decl., Ex. 8. One investor, after being interviewed by the SEC staff, agreed to provide a declaration, but later refused to do so after defendant Wayne Wakefield told him that Bankers Alliance's lawyers were handling the matter, that no investors had complained to the SEC, and that the SEC was just harassing Bankers Alliance. Carolan Decl. at ¶28. Another investor who had agreed to testify informed the staff, after talking with representatives of Bankers Alliance, that he would not testify absent a court order. *Id.* at ¶38.

## II. COMPLAINT, TRO AND PRELIMINARY INJUNCTION

On March 1, 1995, the SEC filed a complaint in this Court alleging that defendants had violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, as well as Section 17(a) and Sections 5 and 5(c) of the Securities Act, 15 U.S.C. §§ 77q(a), 77e(a), 77e(c). It requested a permanent injunction restraining and enjoining the defendants from further violating the Exchange Act and the Securities Act, directing the defendants to disgorge all illegal gains, together with prejudgment interest, and directing defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). The SEC also filed an *ex parte* application for temporary restraining order, asset freeze, accountings and order to show cause.

Upon consideration of the SEC's *ex parte* application, affidavits in support thereof, exhibits thereto and memoranda of law, the Court entered the requested temporary restraining order on March 2, 1995. The Court directed the defendants to hold and retain within their control, and otherwise prevent any disposition, assignments or concealment of any funds or assets received from any actual or potential investors or any other person pursuant to the acts and practices described in the complaint, or any funds or assets held by them, under their control or over which they exercise actual or apparent investment or other authority. It further directed them to cease from soliciting, receiving or depositing into any account any additional investor funds, from advertising or promoting their investment schemes, and from offering to sell or selling investments relating to currency transactions, debenture transactions, off-shore funds, letters of credit or roll programs. The Court also ordered the defendants to file with the Court and serve upon the Commission a sworn accounting and to take steps to repatriate to the United States all funds and assets of investors, partners or associate partners described in the complaint held by them or under their control and to provide a written description of the funds and assets repatriated. The Court restrained the defendants from destroying, concealing, altering or disposing of any documents relevant to this matter. The Court directed the defendants to appear on March 13, 1995, for a hearing on the SEC's application for a preliminary injunction.

Prior to the March 13, 1995 date set for hearing, the defendants retained counsel who met with counsel for the SEC. Counsel for the SEC and counsel for all of the defendants negotiated consents to the entry of preliminary injunctions which in large part continued the terms of the Temporary Restraining Order, with some modifications as negotiated by counsel. Each of the Bankers Alliance defendants and their counsel signed the same consent Preliminary Injunction, as did counsel for the Commission. Defendant Steven Higley signed for Bankers Alliance, and defendant Roy Lee signed for the other entities. The consent Preliminary Injunction was approved by the Court on March 13, 1995, without the necessity for a contested hearing.

Section VII of the Preliminary Injunction applicable to the Bankers Alliance defendants ordered them to provide by March 13, 1995, a sworn accounting, providing, *inter alia,* the name, account number and location of each account maintained in its or his name or in which he or it has an interest; every transaction in which any funds or other assets were transferred between or among itself or himself and any other defendant or from it or him to any entity in which any of the defendants have an ownership interest; and all transactions involving the investment or leveraging of funds raised from investors, partners or associate partners. Section VII.d of the Preliminary Injunction expressly stated that the accounting was to include a description of

> all funds received from investors, partners, associate partners, or any other person in connection with the activities alleged in the complaint, including a list of:
>
> > (i) the name, address, and telephone number of each investor, partner, or associate partner; and
> >
> > (ii) the amount invested by each investor, partner, or associate partner and a statement of the location and disposition of any funds received from investors, partners, associate partners, or other person;

Preliminary Injunction at 11–13 (March 13, 1995).

Paragraph VIII of the consent Preliminary Injunction ordered that the defendants "and each of them"

> a. will, no later than March 20, 1995, or on such other date as the Commission shall agree, repatriate to the territory of the United States all funds and assets of United States investors, partners, or associate partners which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the registry of the United States District Court for the District of Columbia; and

> b. provide the Commission and the Court a written description of the funds and assets so repatriated.

*Id.* at 14.[1]

Late in the day of March 13, 1995, the Bankers Alliance defendants submitted a joint sworn accounting to the SEC. Accounting of Bankers Alliance Corporate Defendants ("Joint Accounting"), Plaintiff's Exhibit No. 1 at Contempt Hearing. The Joint Accounting reflected a total of $3.725 million that had been received from investors, the names of the investors and the amount invested by each. The Joint Accounting, however, disclosed no information about the current location and disposition of investor funds, as required by the Preliminary Injunction. Instead, it stated that

> A certificate of deposit (Cert. No. 931101.0828/USD–IBD) in the face amount of USD $5,000,000 maturing on November 1, 1995, issued by the Industrial and Commercial Bank of China, Shangro Branch on November 1, 1993, is available to be liquidated by Steven Higley to generate funds for repatriation to the United States.

Joint Accounting at 12.

On the morning of March 20, 1995, the deadline for repatriation of investor funds under the Court's Order, the Bankers Alliance defendants informed the SEC, through counsel, that they were unable to liquidate or free up the necessary funds but expected to be able to do so by the end of the week. Declaration of Jonathan I. Golomb ("Second Golomb Decl."), executed on March 22, 1995, at ¶ 5. Counsel also informed the SEC that the Bankers Alliance defendants were sending, for delivery on Wednesday, March 22, 1995, an original certificate of deposit in the amount of $5 million from a bank on mainland China, and a document evidencing assignment of that certificate of deposit to an entity controlled by defendant Steven Higley. Counsel asserted that this was being done to evidence the good faith of the Bankers Alliance defendants in attempting to repatriate the required funds. *Id.*

---

1. In addition, with certain limited exemptions, Section IV of the Preliminary Injunction continued the previously imposed freeze on the disposi-
tion of any assets by defendants Bankers Alliance Corp., B.A. Holding Co., Roy Lee and John Finegan.

On March 22, 1995, the Bankers Alliance defendants, through counsel, advised the SEC that they were in the final stages of liquidating instruments that would yield cash for repatriation and hoped to repatriate those funds by Thursday, March 23, or by Monday, March 27, Singapore time (*i.e.*, Sunday, March 26, in the United States) at the latest. Second Golomb Decl. at ¶ 10. In the interim, counsel for the Bankers Alliance defendants would hold the original certificate of deposit and original assignment of rights. An examination of the certificate of deposit, which thereafter was provided to the Court, shows that it is the same instrument referenced in the Joint Accounting of the Bankers Alliance defendants and that it does not mature until November 1, 1995.

### III. CIVIL CONTEMPT

The Court has both an inherent and a statutory power to enforce compliance with its orders and may exercise that authority through a civil contempt proceeding. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *United States v. United Mine Workers of America*, 330 U.S. 258, 330–32, 67 S.Ct. 677, 713–15, 91 L.Ed. 884 (1947); *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 156 F.R.D. 529, 534 (D.D.C.1994); *SEC v. Current Financial Services, Inc.*, 798 F.Supp. 802, 806 (D.D.C. 1992). Congress codified the courts' contempt powers in 18 U.S.C. § 401, which provides:

> A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as— ...
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

A party commits contempt when it "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir.1987), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988), (*citing SEC v. First Financial Group, Inc.*, 659 F.2d 660, 669 (5th Cir.1981)).

In a contempt proceeding, the moving party has the burden of showing by clear and convincing evidence that (1) a court order was in effect, (2) the order required certain conduct by the respondent, and (3) the respondent failed to comply with the court's order. *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir.1987). *See NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183–85 (D.C.Cir.1981); *SEC v. Current Financial Services, Inc.*, 798 F.Supp. at 806. The Court need not find that the violations were willful or intentional. *SEC v. Current Financial Services, Inc.*, 798 F.Supp. at 806; *NOW v. Operation Rescue*, 747 F.Supp. 772, 774–75 (D.D.C.1990). While the burden of showing a violation of the court order is on the movant, impossibility of performance constitutes a defense to a charge of contempt and a respondent who raises the defense of impossibility "must demonstrate his inability to comply 'categorically and in detail.'" *SEC v. Current Financial Services, Inc.* 798 F.Supp. at 808 (citations omitted); *see Tinsley v. Mitchell*, 804 F.2d 1254, 1256 (D.C.Cir.1986).

Civil contempt is a remedial device intended to achieve full compliance with a court's order. *Hicks v. Feiock*, 485 U.S. 624, 631–32, 108 S.Ct. 1423, 1429–30, 99 L.Ed.2d 721 (1988); *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d at 399–400. Its goal is not to punish but to exert only so much authority of the court as is required to assure compliance. *See Matter of Trinity Industries, Inc.*, 876 F.2d 1485, 1494 (11th Cir.1989); *NOW v. Operation Rescue*, 747 F.Supp. at 774. The sanctions imposed in civil contempt proceedings therefore ordinarily are conditional, and a person or entity held in civil contempt may avoid the sanctions by promptly complying with the court's order. *Hicks v. Feiock*, 485 U.S. at 632–35, 108 S.Ct. at 1429–32; *Penfield Co. v. SEC*, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947).

As discussed below, the Bankers Alliance defendants have violated the terms of this Court's Preliminary Injunction. The clear and unambiguous provisions of the Injunction require the Bankers Alliance defendants to provide an accounting that is to include infor-

mation as to the location and disposition of investor funds and to repatriate such funds. They have refused to do either, and the excuses proffered for their failure to comply are inadequate to justify their conduct. The Court therefore holds them in civil contempt.

## IV. CLEAR AND CONVINCING EVIDENCE OF CONTEMPT

### A. The Accounting Is Deficient

▮ The Bankers Alliance defendants submitted a Joint Accounting, signed by each of them. *But see infra* note 3. In it each of them has admitted receipt of at least $3.725 million from United States investors through the investment program described in the complaint. *See* Joint Accounting at 10–11. Yet nowhere in the Joint Accounting is there a statement of the location and disposition of funds recovered from investors as required by the Court's Preliminary Injunction. Failure to comply fully with an order to provide an accounting is itself a valid basis for a finding of contempt. *SEC v. Current Financial Services, Inc.,* 798 F.Supp. at 808.

The declarations of defendants Roy Lee and Allan Nash do not compel a contrary result. Roy Lee is the President of L.F.S. Lee Financial Services, the President of Lee Financial Group, Ltd., a principal in B.A. Holding Co., and Treasurer of Bankers Alliance Corp. Declaration of Roy Lee ("Lee Decl.") at ¶¶ 3–5, Defendants' Exhibit No. 1 at Contempt Hearing. Mr. Lee states in his declaration that all funds and assets received from investors were wire-transferred from Bankers Alliance and B.A. Holding Co. accounts at First of America, Comerica Bank and Bank One in the United States to two Lee Coy Traders accounts at Citibank in Singapore. He admits that he has joint signatory authority with defendant Steven Higley over one of these Singapore accounts. Lee Decl. at ¶¶ 7, 10; Joint Accounting at 3. Mr. Higley is a joint signatory with Mr. Stupaya Sio Ayaro, who is not a defendant in this action, on the second account. Joint Accounting at 3. Defendants' currency trading was to be done out of these two Lee Coy Traders accounts at Citibank, those on which Mr. Higley was a cosignatory with either Mr. Lee or Mr. Ayaro. Post–Hearing Declara-

tion of Deborah R. Meshulam ("Meshulam Decl.") at ¶ 6(d)(iv); Deposition of Fred Rumack ("Rumack Dep."), Meshulam Decl., Ex. 5 at 149–52.

Mr. Lee has provided no evidence that money was transferred out of either of the Citibank accounts. Yet he states that *since March 2, 1995,* the day on which the Court issued its Temporary Restraining Order, neither of his companies—Lee Financial Group, Ltd. nor L.F.S. Lee Financial Services—has held or controlled any of these funds and that since that date neither he nor his companies "have had any knowledge of the location or disposition of any of the funds received...." *Id.* at ¶¶ 9, 12.

The Court does not credit Mr. Lee's statement that he now has no knowledge of the status of the account to which he was a joint signatory. *See* Lee Decl. at ¶ 10. He has not stated that he has sought to obtain the records of the account or that he is not entitled to such records. He has not said that he has asked his codefendant and cosignatory, Mr. Higley, where the funds have gone—if they have gone anywhere. He simply pleads ignorance to any knowledge of the account's status or to the location of investor funds after March 2, 1995. The Court will not permit Mr. Lee to hide behind his apparently self-created veil of ignorance. It is inconceivable that Mr. Lee does not know or cannot find out what happened to the money under his control. Lee must account for where the funds have gone since being transferred to the Citibank accounts, and, indeed, whether the funds have ever left the Citibank accounts.

Allen Nash is Vice President of L.F.S. Lee Financial Services, Inc., Vice President of Lee Financial Group, Ltd., and Secretary of Bankers Alliance Corp. Declaration of Allan D. Nash ("Nash Decl.") at ¶¶ 3–5, Defendants' Exhibit No. 2 at Contempt Hearing. He states that *since March 2, 1995,* he has not held or controlled any investor funds or assets and has "had no knowledge of the location or the disposition of any funds received...." Nash Decl. at ¶¶ 8, 10. Mr. Nash does not state what he knew before the Court entered the Temporary Restraining

Order on March 2, 1995, or what he or his codefendants may have done with the funds upon receiving notice of the TRO.

The assertions of their lack of knowledge and control notwithstanding, the declarations of Messrs. Lee and Nash nowhere state that it was impossible for the Bankers Alliance defendants to provide a full accounting, including information about the location and disposition of investor funds, as required by the Court's Preliminary Injunction. Because impossibility is a defense to civil contempt, the burden is on them to "demonstrate [their] inability to comply 'categorically and in detail.'" *SEC v. Current Financial Services Inc.*, 798 F.Supp. at 808; *see also Tinsley v. Mitchell*, 804 F.2d at 1256. Yet, Mr. Lee and Mr. Nash have provided no evidence that compliance was impossible. Furthermore, their declarations nowhere state or otherwise show why Messrs. Lee and Nash would have agreed to this provision of the Preliminary Injunction if they believed compliance was impossible. Rather, the Court can infer from their carefully worded declarations that *before* March 2, 1995—the day this Court entered its Temporary Restraining Order, of which defendants were given notice—Messrs. Lee and Nash knew where the investor funds were located, that Mr. Lee was one of those who had control over the funds and that both Mr. Lee and Mr. Nash know where the funds were moved (if they were moved) before the Joint Accounting was filed.[2]

Rather than declare lack of knowledge as a defense, after signing the Joint Accounting and filing it with the Court, defendants Steven Higley and John Finegan invoked their Fifth Amendment privilege not to be compelled to provide testimony that may incrimi-

nate them. Declaration of Steven C. Higley, Defendants' Exhibit No. 3 at Contempt Hearing; Declaration of John Finegan, Defendants' Exhibit No. 4 at Contempt Hearing.[3]

The Court must construe the privilege against self-incrimination broadly and must sustain it if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–19, 95 L.Ed. 1118 (1950); *see also Steinbrecher v. C.I.R.*, 712 F.2d 195, 198 (5th Cir.1983); *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 156 F.R.D. at 535. The Court need not, however, excuse a party from answering "merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination." *Hoffman v. United States*, 341 U.S. at 486, 71 S.Ct. at 818. Rather, a party invoking the Fifth Amendment "must show a 'real danger,' and not a mere imaginary, remote or speculative possibility of prosecution" based on the information withheld. *In re Morganroth*, 718 F.2d 161, 167 (6th Cir.1983) (citations omitted); *see In re Sealed Case*, 825 F.2d 494, 497 (D.C.Cir.), *cert. denied, Roe v. United States*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987); *Steinbrecher v. C.I.R.*, 712 F.2d at 197. He bears the burden of proving that the danger exists by coming forward "with credible reasons why revealing such information presents more than a frivolous fear of incrimination." *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 156 F.R.D. at 537 (quoting *In re Connelly*, 59 B.R. 421, 435 (Bankr.N.D.Ill.1986)); *see Uec-*

---

2. Further undermining the credibility of the declarations of Mr. Lee and Mr. Nash are their statements that the business of L.F.S. Lee Financial Services, Inc., and Lee Financial Group, Ltd., has always been unrelated to the activities alleged in the Complaint. Lee Decl. at ¶¶ 3–4; Nash Decl. at ¶¶ 3–4. To the contrary, as the SEC has shown, these organizations played a substantial role in obtaining the advertisements in the *Wall Street Journal* that solicited investor funds. Transcript of March 29, 1995, Contempt Hearing at 32, 80–82; Carolan Decl., Ex. 4.

3. It is unclear whether Mr. Finegan in fact signed the Joint Accounting. The photocopy of the Joint Accounting, with the faxed signatures of the other defendants, that was submitted to the Court does not contain Mr. Finegan's signature, although it states that it is submitted on behalf of John Finegan and the other Bankers Alliance defendants. If Mr. Finegan has not signed the Joint Accounting and seeks to avoid being bound by the Joint Accounting that the Bankers Alliance defendants submitted to the SEC, then he has failed to provide *any* accounting in violation of the entirety of Section VII of the Preliminary Injunction rather than just a portion of it.

*kert v. C.I.R.*, 721 F.2d 248, 250 (8th Cir. 1983).

■ The Court finds that it is not apparent how Mr. Higley's and Mr. Finegan's revealing information about the location and disposition of investor funds is any more incriminating than what they already have revealed in the Joint Accounting. They have not shown, or even attempted to show, how disclosing the additional information required by the Court's Order would incriminate them. These defendants have failed to provide any credible evidence (or any evidence whatsoever) that they have a nonfrivolous fear of further incrimination or prosecution. They have asserted the Fifth Amendment privilege in conclusory language without demonstrating a good faith basis as to why they believe their statements will incriminate them.[4]

■ As for defendants Bankers Alliance Corp., Lee Financial Group Ltd., L.F.S. Lee Financial Services, and B.A. Holding Co., each of these entities signed the Joint Accounting through an agent, Mr. Higley for Bankers Alliance and Mr. Lee for each of the other defendants. Each of them also is in contempt of the Court's Order by failing to provide information required by the Preliminary Injunction, the terms of which they negotiated through counsel and which they signed through their agents, Messrs. Higley and Lee.[5]

The Court therefore concludes that all of the Bankers Alliance defendants are in contempt of the Court's Order to provide an accounting of the location and disposition of investor funds.

## B. The Defendants Have Failed To Repatriate

■ In the Preliminary Injunction, which they negotiated through counsel, consented to and signed, the Bankers Alliance defendants knowingly agreed to repatriate all investor funds or assets by March 20, 1995. By the Joint Accounting, each defendant admitted having received at least $3.725 million from investors. *See* Joint Accounting at 10–11. The defendants' repeatedly represented that they would repatriate these funds. Because they did not repatriate the funds as required, the defendants are in contempt of the Court's Order.

The defendants have made representations to the SEC and to the Court on several occasions that they would return the investor funds to the United States. In a March 7, 1995, hearing before the Court, the Bankers Alliance defendants represented, through counsel, that they would return the investor funds to the United States by March 20, 1995. Transcript of March 7, 1995, Hearing at 3. In the Opposition of the Bankers Alliance Defendants to Application for Order to Show Cause, filed on March 24, 1995, the defendants asserted that they had "made substantial efforts to repatriate the $3,725,-000 received from U.S. investors through the investment program described in the Complaint" and that

> within a matter of days, [defendants] intended to substitute cash for the [certificate of deposit] and assignment. Defendants have undertaken that, by Monday, March 27, at the latest, they will transfer $3,725,000 to counsel for immediate re-

---

4. There is also a serious question whether Mr. Higley has waived his Fifth Amendment privilege as to the movement and location of the investor funds that were contained in the Citibank accounts by signing the consent Preliminary Injunction and by disclosing in the Joint Accounting that investor funds were held in the Citibank accounts to which he was a cosignatory. *See* Joint Accounting at 3. By signing the Preliminary Injunction and the Joint Accounting, Mr. Finegan also may have waived his right not to be compelled to disclose the particulars in the Joint Accounting. *See Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951); *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 156 F.R.D. at 535, 536–37.

5. Even if Mr. Higley could justify the invocation of his own Fifth Amendment privilege, it would not apply to information regarding the location and disposition of investor funds that may be in the possession of Bankers Alliance. No Fifth Amendment privilege is available to a corporation, and an "individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." *Bellis v. United States*, 417 U.S. 85, 88, 94 S.Ct. 2179, 2183, 40 L.Ed.2d 678 (1974); *see Braswell v. United States*, 487 U.S. 99, 110, 108 S.Ct. 2284, 2291, 101 L.Ed.2d 98 (1988).

transmission to the Court Registry.... There was no reason for Defendants to place a $5 million CD within the reach of the SEC if their goal was to avoid repatriating investor funds.

Def.s' Opp. at 2–3.,

Statements made to investors by the defendants also support the inference that the defendants controlled the funds and therefore were capable of repatriating them. After the TRO was entered, defendant Nash told one investor that the funds were being returned to the United States. Meshulam Decl. ¶ 6(c); Deposition of William Brogden, Meshulam Decl., Ex. 4 at 140–41 and Dep. Ex. 24. Messrs. Finegan and Higley told another investor that he could withdraw his funds with thirty days' notice. Meshulam Decl. at ¶ 6(d)(ii); Rumack Dep. at 82–83, 85; see also Meshulam Decl. at ¶ 6(b)(iv); Deposition of Richard Kendall ("Kendall Dep."), Meshulam Decl., Ex. 3 at 60–61. For the investors to have this ability, the funds would have had to be under the control of Mr. Finegan or Mr. Higley. In a March 29, 1995, document entitled "Latest Legal Update" from Bankers Alliance to its investors and partners and faxed to the Court, the Bankers Alliance defendants briefly explained their view of the SEC investigation and stated that "This Does Not Affect Our Private Placement." If the SEC investigation and the resulting Court proceedings do not affect the defendants' placements of investor funds, the Court necessarily must believe that defendants retain control over the investor funds.

Furthermore, in the contracts entered into between the investors and the defendants, defendants Nash and Finegan promised to manage investments for the investors or to place the investments into the marketplace for liquidation. Bankers Alliance Investment Contract, Carolan Decl., Ex. 6 at 2; see also Meshulam Decl. at ¶ 6(a) and Ex. 2. In order to manage the investments, the defendants had to retain control over the investments. The contracts also stated that Bankers Alliance, Mr. Nash or Mr. Finegan either would engage in currency transactions or secure a letter of credit for those funds. Carolan Decl., Ex. 6 at 2; Meshulam Decl., Ex. 2 at 2. The Joint Accounting indicates that the defendants engaged in no currency transactions. Joint Accounting at 12. The investor funds therefore should be available in letters of credit that could be liquidated by Bankers Alliance, Mr. Nash or Mr. Finegan. In that case, investor funds could be repatriated to the United States.

Defendant Lee stated in his declaration that $3.725 million in investor funds were transferred from the United States to two Citibank accounts located in Singapore. Lee Decl.. at ¶ 7. Lee was a cosignatory on one of these accounts and Higley was a cosignatory on both accounts. Joint Accounting at 3. According to the defendants, none of the investor funds were used in currency transactions or other transactions nor were the funds leveraged in any other manner. Joint Accounting at 12. The record therefore shows that the defendants received $3.725 million of investor funds and that these funds were transferred from accounts in the United States to accounts in Singapore that were under the control of some or all of the defendants. Because no evidence has been offered that the funds were transferred *from* the accounts, and in the absence of any evidence of impossibility, the Court may infer that the defendants have the wherewithal to repatriate the funds.

Even if funds were transferred from the accounts, the Court may infer from the invocation of the Fifth Amendment by Messrs. Higley and Finegan that they know the location and disposition of any funds that have been transferred from the accounts. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). From the evidence discussed above, the Court may also infer that they have control of those funds. The SEC offered probative evidence that Messrs. Higley and Finegan knew of the locations of investor funds and the disposition of the funds at the time the Joint Accounting was filed. *See* Joint Accounting at 3 (identifying Steven Higley as a cosignatory for the accounts of Lee Coy Traders); Rumack Dep. at 149–52 (stating that currency trading was to occur out of the Lee Coy Traders accounts); Kendall Dep. at 35, 43 (stating that John Finegan said he would set up the trading account and would conduct the trading).

The Court therefore may consider the invocation of the privilege by defendants Higley and Finegan as an additional factor indicating that they know where the funds are located and have the ability to repatriate them. *Baxter v. Palmigiano*, 425 U.S. at 316–20, 96 S.Ct. at 1557–59; *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977); *Aradia Women's Health Center v. Operation Rescue*, 929 F.2d 530, 532 (9th Cir.1991); *SEC v. International Loan Network, Inc.*, 770 F.Supp. 678, 695–96 (D.D.C.1991).

As noted, the carefully worded declarations of Messrs. Lee and Nash, as well as the fact that the investors were told prior to issuance of the TRO that they would receive statements of their accounts as of April 1, 1995, Carolan Decl. at ¶ 36, suggest that the Bankers Alliance defendants had control of investor funds and information about their location prior to entry of the TRO and that they took certain actions thereafter to distance themselves from the funds. If that is the case, they both violated the TRO—an act of contempt in itself—and acted in bad faith when they agreed to the Preliminary Injunction. The clear inference from the record is that these defendants jointly possess the requisite control and simply have refused to comply with this Court's Preliminary Injunction.

As for the issue of impossibility, once the SEC established by clear and convincing evidence that the defendants failed to comply with the specific court Order to repatriate investor funds, as it has, the burden shifted to the defendants to make a categorical, detailed showing of the impossibility of complying with the Preliminary Injunction. *SEC v. Current Financial Services Inc.*, 798 F.Supp. at 808; *see Tinsley v. Mitchell*, 804 F.2d at 1256. The burden is on them to provide evidence of their *"present* inability to comply with the order in question." *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983).

Defendants have failed to make such a showing or to produce any such evidence. They attempt to assert impossibility by stating that the funds now are in the possession of certain unidentified "foreign controlled joint ventures," over which defendants presumably can exert no control. Defendants have offered no credible evidence that such joint ventures actually exist, that the funds are indeed located with such joint ventures or that they do not have control over investor funds, whether they reside with the joint ventures or not. The defendants are grounding their claimed lack of control, and thus their claim of impossibility, on information— the location of the funds with certain joint ventures—that they have refused to disclose to the Court.

Defendants Lee and Nash have offered incredible explanations regarding their lack of knowledge, while defendants Higley and Finegan have remained silent, thus entirely avoiding their burden of production on the issue of impossibility. *See United States v. Rylander*, 460 U.S. at 755–58, 103 S.Ct. at 1551–53. The Court will not permit the Bankers Alliance defendants to base their impossibility claim upon their refusal to comply with the Court's Order directing them to disclose, before the date of repatriation, the location of the investor funds. The defendants have failed to meet their burden of production on their impossibility defense. *Id.*

Finally, the Court will not accept the $5 million Certificate of Deposit as compliance with the Court's Order to repatriate investor funds. The CD does not mature until November 1, 1995. It is drawn on a bank of the Peoples Republic of China, is assigned from Dennis Chua Teck Gee to Lee Coy Traders, neither of whom are defendants in this action, and is assigned from Lee Coy Traders to defendant Steven Higley. *See* Copy of Certificate of Time Deposit and Assignments, Defendants' Exhibit No. 5 at Contempt Hearing. The Court's having physical possession of the CD provides no assurance that it can be redeemed on November 1, 1995. For the CD to have any value in November 1995, and to be reduced to funds then, requires the cooperation of Mr. Higley, a defendant who is outside the United States. Neither the SEC nor the Court can be assured that such cooperation will be forthcoming in view of Mr. Higley's responses to his obligations to date. Furthermore, the defen-

dants have provided no proof that the CD has any value whatsoever, let alone a value of at least $3.725 million. The defendants ask the SEC and this Court to accept the CD as compliance with the Preliminary Injunction based on the good faith of defendants. They have given the Court and the SEC no good reason to do so.[6]

## V. CONCLUSION

For the foregoing reasons, the Court holds each of the Bankers Alliance defendants in civil contempt. They are directed to comply with the provisions of this Court's Preliminary Injunction that they have violated, Sections VII.(d) and VIII, within ten days from the date of this Order. Their failure to do so will result in warrants being issued for the arrest of the individual defendants and of fines being imposed on all of the Bankers Alliance defendants—$25,000 a day for the first five days of their failure to comply, $50,000 a day for the next five days, $75,000 a day for the next five days, and $100,000 a day for each day thereafter—until they purge themselves of their contempt. An Order of Civil Contempt will be issued this same day.

SO ORDERED.

*ORDER HOLDING DEFENDANTS BANKERS ALLIANCE CORP., LEE FINANCIAL GROUP, LTD., L.F.S. LEE FINANCIAL SERVICES, B.A. HOLDING CO., ROY LEE, STEVEN HIGLEY, ALLAN NASH AND JOHN FINEGAN IN CIVIL CONTEMPT, IMPOSING SANCTIONS, AND RESCINDING RELIEF FROM THE ASSET FREEZE*

This matter is before the Court on the application of Plaintiff Securities and Exchange Commission for an order holding Defendants Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Allan Nash and John Finegan in civil contempt for their violations of the Court's

Preliminary Injunction order regarding: (1) the repatriation of assets to the United States; and (2) the submission of a sworn accounting of the location and disposition of funds raised from investors, and rescinding relief from an asset freeze.

The Court has considered the Commission's Application, supporting Memorandum of Points and Authorities, Opposition of the Bankers Alliance Defendants to the Application, Commission's Reply in Further Support of Order to Show Cause, Response of Bankers Alliance Defendants to Order to Show Cause, Commission's Reply to Bankers Alliance Defendants' Response to Order to Show Cause, Post–Hearing Memorandum of the Bankers Alliance Defendants, Commission's Reply to the Bankers Alliance Defendants' Post–Hearing Memorandum, Declaration of Howard T. Carolan, Jr., Declarations of Jonathan I. Golomb, Declaration of Deborah R. Meshulam, the arguments upon the application and the evidence introduced at the hearing on March 29, 1995.

WHEREAS, it appears from the above-described materials that:

1. Defendants Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Allan Nash and John Finegan have failed to comply with the Order of this Court dated March 13, 1995, the entry and terms of which were consented to by them, requiring them to repatriate investor funds, estimated by them at $3.725 million, into the registry of this Court, and have further failed to comply with the provision of that Order requiring them to account for, *inter alia,* the location and disposition of funds raised from investors.

2. Defendants have failed to demonstrate an inability to comply with the Order.

WHEREFORE, the Court is satisfied that the Commission has made a sufficient and proper showing in support of the relief granted herein, pursuant to 18 U.S.C. § 401.

NOW, THEREFORE,

---

**6.** In view of the Court's conclusions with respect to the CD and its finding that the Bankers Alliance defendants are in civil contempt for refusing to comply with the provision of the Court's

Order requiring repatriation, the Court will return the CD to counsel for the Bankers Alliance defendants within 72 hours of the entry of its Contempt Order.

## I.

It is hereby ORDERED that Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Allan Nash and John Finegan are in civil contempt of the orders of this Court contained in the Preliminary Injunction regarding: (1) the repatriation of assets to the United States; and (2) the submission of a sworn accounting of the disposition of funds raised from investors.

## II.

It is FURTHER ORDERED that Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Allan Nash and John Finegan shall comply fully with the requirements of Sections VII and VIII of the Preliminary Injunction entered against them on March 13, 1995, no later than 5:00 p.m. Eastern Daylight Time on April 17, 1995.

## III.

It is FURTHER ORDERED that, if the requirements of Section II of this Order are not complied with by the time set forth therein:

(a) a warrant be issued for the arrest of Defendants Roy Lee, Steven Higley, Allan Nash and John Finegan by reason of their contempt. They shall remain confined until such time as the contempt is purged, that is, until such time as they effect a repatriation of funds raised from investors and provide a complete accounting of the disposition of such funds, and otherwise comply fully with all other provisions of Sections VII and VIII of this Court's March 13, 1995, Order; and

(b) Defendants Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Lee Financial Services, B.A. Holding Co., Roy Lee, Steven Higley, Allan Nash and John Finegan shall pay a fine of $25,000 per day for the first five days they fail to comply after the time set forth in Section II, $50,000 per day for the next five days, $75,000 per day for the next five days, and $100,000 per day until such time as the contempt is

purged or until further order of the Court.

## VI.

It is FURTHER ORDERED that the provisions of sections IV.b.(i), IV.b.(ii), V.b.(iii), and IV.b.(iv) of the Preliminary Injunction entered on March 13, 1995, allowing Defendants Bankers Alliance Corp., B.A. Holding Co., Roy Lee and John Finegan to expend otherwise frozen funds for living expenses, legal fees, costs of compliance with the Preliminary Injunction, and other reasonable expenses, are hereby rescinded, effective immediately.

SO ORDERED.