Joy EVANS, et al., Plaintiffs,

United States of America,
Plaintiff–Intervenor,

v.

Anthony A. WILLIAMS,
et al., Defendants.

No. Civ. 76–293–SSH.

United States District Court,
District of Columbia.

Feb. 10, 1999.

Joseph B. Tulman, District of Columbia School of Law, Washington, DC, Kelly Bagby, University Legal Services, Washington, DC, for Joy Evans, Venita Felton, Christine Exton, Joseph Scates, William Brown, John Kennedy.

Laurie J. Weinstein, Department of Justice, Civil Rights Division, Washington, DC, Richard James Farano, U.S. Department of Justice, Washington, DC, for United States of America.

David T. Ralston, Jr., Hopkins & Sutter, Washington, DC, for We Care Projects, Inc.

Barbara J. Mann, Melvin W. Bolden, Jr., Office of Corporation Counsel, D.C., Washington, DC, for Marion Barry, District of Columbia.

Margaret G. Farrell, Chevy Chase, MD, special master.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are plaintiffs' motion for sanctions, plaintiff-intervenor's memorandum in support thereof, defendants' motion for modification of the 1983 Consent Order, the Special Master's Recommended Findings of Fact and Conclusions of Law regarding the preceding motions, and related pleadings. Also before the Court are defendants' demand for a jury trial and related pleadings. On July 22, 1998, the parties presented their positions to the Court in a hearing on the legal issues pertinent to the pending motions. Upon full consideration of all the pleadings and the entire record, the Court adopts in part, and rejects in part, the Special Master's Recommended Findings of Fact and Conclusions of Law.[1]

### Background

Plaintiffs are members of a class consisting of former residents of the long-since closed Forest Haven facility. An integral·part of this litigation has been the relocation of the class members from Forest Haven to community living arrangements with adequate habilitation suited to each class member. To this end, the Court has entered numerous orders, including consent orders agreed to by the parties to safeguard the rights of class members and ensure their adequate and appropriate habilitation.

A Consent Order was entered on February 8, 1983 ("1983 Consent Order"). To help ensure a viable network of private vendors which would provide the class members with appropriate care (*"Evans,* care providers"), the Consent Order required defendants to pay for goods and services within 30 days of the receipt of an acceptable voucher. Consent Order, Feb. 8, 1983, Section IX, Para. 10. On October 11, 1995, the Court found defendants in contempt of the 1983 Consent Order for failure to make timely vendor payments during the years 1994 and 1995. The Court appointed a Special Master to recommend a plan for purgation of defendants' contempt.

The Special Master submitted a report on January 22, 1996, and a supplemental report on June 17, 1996. On August 2, 1996, the Court issued an Order adopting in large part the Special Master's recommendations. In that Order, the Court updated its October 11, 1995, finding of contempt by concluding that defendants continued to be in contempt between October 11, 1995, and June 17, 1996 (when the Special Master submitted her supplemental report). In the "Order Adopting Proposed Findings of Fact of Special Master," the Court stated in part:

Defendants have, for over two years, chronically and unapologetically violated the terms of nearly every aspect of this Court's multiple Consent Orders. Defendants' unrelenting contempt of this Court's orders and their seeming inability to bring themselves into compliance therewith, have created chaos for the care providers vested with day-to-day responsibility for the members of this plaintiff class....

... Now, the point has been reached beyond which this Court will not tolerate

---

1. This opinion, as would be expected, has been in preparation for some time, and the Court wishes to avoid any further delay in issuing it. Accordingly, it is issued without regard to the motion that plaintiffs filed on February 2, 1999. The release of this Opinion undoubtedly affects the relief sought by the new motion, and the other parties need not respond to that motion with reference to its date of filing. To establish a schedule for pleadings directed to that motion, plaintiffs are directed within 14 days of the date of this Opinion to file a pleading expressing how the new motion is affected by this Opinion and

clarifying their current position, following which the other parties may submit responsive pleadings in accordance with the normal scheduling rules.

In connection with the passage of time, although the undersigned never before has made any reference to personal factors in an opinion, he feels constrained to note that two unanticipated hospitalizations, with coronary artery surgical procedures, contributed (along with many other judicial responsibilities) to delaying the completion of this task.

further and continuing incidences of contempt by defendants. Any further noncompliance with this Court's longstanding Consent Orders, and noncompliance with the Remedial Plan issued this date, must be expected by defendants to result in serious consequences.

Accompanying that Order, the Court also issued a Remedial Plan ("Remedial Plan"). The Remedial Plan reasserted defendants' obligation (originally imposed in the 1983 Consent Order) to pay acceptable vendors' vouchers within 30 days of their submission (Section I.B). The Remedial Plan also established the conditions by which defendants could purge their civil contempt as adjudicated by the Court's October 11, 1995, and the August 2, 1996, Orders. Section I.D of the Remedial Plan states:

Accordingly, it hereby is

ORDERED, that should defendants fail to purge their contempt by paying acceptable provider invoices within 30 days of submission, as required by this Remedial Plan, at the end of the first month in which defendants report that there are outstanding Medicaid payments due but not paid within 30 days of submission of an acceptable invoice, defendants shall be assessed a coercive civil fine of $5,000 a day, until the overdue payments are made. . . . It hereby further is

ORDERED, that with respect to non-Medicaid payments found to be overdue, defendants shall be assessed a coercive civil fine of twice the amount overdue. . . . It hereby further is

ORDERED, that civil fines shall be paid to the Clerk of the Court and placed in a segregated account, from which the Court, at the recommendation of the Special Master, may order payment to providers.

Such fines are to be calculated by relying upon the information provided by defendants' sworn monthly submissions to the Court (re-quired by Section I.C of the Remedial Plan) listing Medicaid and non-Medicaid vendors who have not been paid within the required 30–day time period.

On April 2, 1997, plaintiffs filed a motion for sanctions for defendants' alleged violation of the provisions of the Remedial Plan requiring timely payment of *Evans* care providers.[2] Defendants filed their opposition to plaintiffs' motion for sanctions as well as their own motion for modification of the 30–day payment period which was established by the 1983 Consent Order and reaffirmed by the Remedial Plan.

Plaintiffs and plaintiff-intervenor contend that defendants have conceded, in their sworn submissions to the Court, their failure to comply with the provisions of the Remedial Plan regarding timely payment of vendors, and that sanctions should therefore be imposed. Defendants contend that no sanctions should be imposed because they were unable to comply with the timeliness provisions of the Remedial Plan. Defendants also request modification of both the 1983 Consent Order and the Remedial Plan pursuant to Federal Rules 60(b)(5) and (6) to extend the 30–day payment period to 45 days, a proposal which is opposed by both plaintiffs and plaintiff-intervenor. Defendants further contend that even if sanctions were applicable, the sanctions may not properly be imposed absent a criminal jury trial because the proposed fines allegedly are criminal rather than civil in nature.

Upon consideration of plaintiffs' and defendants' motions, the Special Master filed her Recommended Findings of Fact and Conclusions of Law on January 26, 1998. The Special Master concluded that defendants owed more than $6 million in fines pursuant to the Remedial Plan.[3] She concluded that half of that amount is due for defendants' failure to purge their 1995 contempt by complying with the timeliness provisions of the

---

**2.** The United States, as plaintiff-intervenor, filed a memorandum in support of plaintiffs' motion for sanctions on April 21, 1997.

**3.** The Special Master calculated this amount based on defendants' violations for the period between September 1996 (after the Court's finding of contempt on August 2, 1996) and Septem-ber 1997. As explained later in this Opinion in footnote 11, the Court calculates its fines based on defendants' violations for a shorter period between the Court's finding of contempt on August 2, 1996, and the filing of plaintiffs' motion for sanctions on April 2, 1997.

Remedial Plan. She found that the other half is due for defendants' violation of the Remedial Plan's independent provision reasserting the 1983 Consent Order's requirement that defendants pay uncontested vendors' vouchers within 30 days of submission. Such fines, the Special Master concluded, automatically are triggered by the Remedial Plan's own provisions upon defendants' admission of noncompliance and, thus, no motion by plaintiffs should be necessary to prompt defendants' payment of the appropriate fines. She also proposed amendment of the Remedial Plan to clarify that the fines are automatic and to provide for their implementation. The Special Master also recommended rejecting defendants' motion to modify the 30–day payment period for vendors, as required in the 1983 Consent Order and the Remedial Plan.

In addition, the Special Master offered several independent modifications to the 1983 Consent Order and the Remedial Plan: (1) changing the amount of the *per diem* fines for delinquent Medicaid payments and replacing the current fines for delinquent non-Medicaid payments with *per diem* fines; (2) including a provision that would permit forgiveness of *per diem* fines assessed for failure to make timely payments if defendants paid vendors within 45 days of the submission of uncontested vouchers; and (3) requiring the Special Master, within a year of the date of this Opinion, to propose a plan for the disposition of the fines paid by defendants, including suggestions regarding their utiliza-

tion to establish a mechanism to protect the habilitation interests of the plaintiff class after the hoped-for conclusion of this now 23–year–old lawsuit.

On February 9, 1998, defendants appealed the Special Master's recommendations to this Court. On February 20, 1998, defendants filed a jury demand and their objections to the Special Master's Recommended Findings of Fact and Conclusions of Law. Also on that date, plaintiffs filed their response and objections to the Special Master's Recommended Findings of Fact and Conclusions of Law, and the United States filed a memorandum in support of the Special Master's recommendations.[4] On July 22, 1998, the Court held a hearing on the legal issues raised by the pending motions and the Special Master's Recommended Findings of Fact and Conclusions of Law (and the objections and responses thereto).

*Findings of Fact and Conclusions of Law*

The Court adopts the Special Master's conclusion that defendants owe substantial fines due to their noncompliance with the purgation conditions of the Remedial Plan, and relies on her factual determinations in calculating the amount owed.[5] Thus, the Court grants plaintiffs' motion for sanctions. However, the Court does not adopt the Special Master's position that such fines are automatic in nature and that no action on the part of plaintiffs, plaintiff-intervenor, or the Court is necessary to render them due. Accordingly, the Court also declines to accept her recommendation that the Remedial Plan

---

4. On March 6, 1998, the United States and plaintiffs filed oppositions to defendants' jury demand. On March 23, 1998, defendants filed a reply to the United States' and plaintiffs' oppositions to their jury demand and a supplemental memorandum in support of their objections to the Special Master's Recommended Findings of Facts and Conclusions of Law.

5. The Court notes that defendants briefly allude in their objection to the Special Master's report to their "right" to an evidentiary hearing prior to the imposition of sanctions. It is uncontested that defendants have never requested a formal hearing before the Special Master regarding the pending matters. The Referral Order states in part that "[a]t a hearing before the Court, the parties shall be precluded from submitting evidence to the Court that could reasonably have been submitted to the Special Master." *See* Oct.

10, 1996, Order of Reference, Para. 18. At the July 22, 1998, hearing on the legal issues raised by the pending motions, defendants failed to point to any evidence which they would introduce—were this Court to hold an evidentiary hearing—which they could not reasonably have presented to the Special Master. Their pleadings also fail to make any such showing. In sum, defendants have failed to establish or even hint at the existence of any evidence which would be admissible at an evidentiary hearing were one to be held. Accordingly, the Court denies defendants' request for an additional opportunity to submit evidence which already has or should have been submitted. The Court notes, however, that it has carefully considered in its decision of the pending motions the evidence properly submitted by defendants in support of their pleadings.

be amended to clarify the automatic nature of the fines and to provide an administrative mechanism for their collection. As to defendants' motion for modification of the 30-day period for payment of vouchers, the Court adopts the Special Master's recommendation that it be denied.

The Court also adopts the Special Master's independent suggestions that, for the sake of comparability and efficiency, the *per diem* fine for delinquent payment of Medicaid vouchers be increased and that the non-Medicaid fine be changed to a *per diem* fine. Furthermore, the Court adopts her recommendation that the Remedial Plan be amended to permit forgiveness of fines accrued by defendants for failure to make required payments within the 30-day period when payment is made within 45 days of the submission of an uncontested Medicaid or non-Medicaid voucher. Finally, the Court adopts the Special Master's recommendation that the Remedial Plan be amended to require the Special Master to submit a report including suggestions for the disposition of the fines paid by defendants and for steps to bring this extraordinarily protracted litigation to an end, both with the goal of protecting the plaintiff class' habilitation needs.

## I. Sanctions

### A. The Imposition of Sanctions

It is indisputable that defendants were held in contempt by the Court's Orders of October 11, 1995, and August 2, 1996, for their failure to comply with the timely payment provisions of the 1983 Consent Order. It also is not disputed that the Remedial Plan included provisions allowing defendants to

purge their adjudicated contempt by paying acceptable vouchers within 30 days of their submission, and that the Remedial Plan imposed penalties for noncompliance with the timeliness requirement. Defendants—as indicated by their own sworn submissions to this Court and acknowledged in their pleadings—do not dispute that they failed repeatedly to make timely payments of vendors as required by the Remedial Plan to purge their contempt.

Nonetheless, defendants assert that they should not be subject to sanctions because they were simply incapable of paying all acceptable vouchers within 30 days of their submission, and thus, compliance with the purgation condition requiring timely payment was impossible. They further argue that the proposed sanctions are criminal rather than civil in nature, and, therefore, that they are entitled to criminal procedures prior to the imposition of such sanctions. The Court adopts the Special Master's findings and conclusions in Sections II.E, II.F, and III of her report and thus rejects defendants' contention that changed circumstances render the imposition of sanctions impermissible or unjust. The Court also adopts the Special Master's analysis in Section II.C regarding the nature of the sanctions to be imposed and concludes, as she did, that they are civil rather than criminal in nature and that provision of criminal procedures prior to the imposition of sanctions is thus unwarranted. Accordingly, the Court finds that defendants have failed to comply with the purgation conditions of the Remedial Plan and that the imposition of sanctions is warranted for defendants' failure to purge the 1995 and 1996 findings of contempt.[6]

---

6. The Special Master characterizes half of the sanctions as being due for failure to purge the contempts adjudicated by the October 11, 1995, Order and the August 2, 1996, Order, and the other half as "new" or "continuing" contempts (of the Remedial Plan's independent timeliness requirement) for which fines are due automatically. Because the Court does not agree with the Special Master's conclusion that the fines provided for by the Remedial Plan are automatic, it currently imposes fines only for defendants' failure to purge the contempts adjudicated by this Court's 1995 and 1996 Orders and only for the period prior to the filing of the plaintiffs' motion for sanctions.

As noted by the Special Master, the language of the Remedial Plan's sanctions provisions regarding timely payment mandates the imposition of specified fines for failure to comply with those purgation conditions. Defendants provide the Court with no persuasive justification for disregarding this mandatory language and permitting them additional opportunities to purge their contempt. The Court concludes that such laxity—after the Court's clear admonition to defendants in its 1996 Order that future noncompliance with the timeliness requirements would result in severe consequences—would effectively negate the coercive effect of such fines. Accordingly, the Court concludes that defendants have failed to

## B. *The Nature of the Fines*

Plaintiffs, plaintiff-intervenor, and the Special Master contend that the Remedial Plan establishes automatic fines for noncompliance with its conditions of purgation or its independent requirement that defendants pay vendors within 30 days of the submission of an acceptable voucher. The Court rejects the characterization of the fines as being automatic. This Opinion requires defendants to pay sanctions for their failure to comply with the Remedial Plan's purgation and payment requirements, thereby ending, as of the date of this Opinion, the period of contempt established by the Court's Order of October 11, 1995, as updated by its August 2, 1996, Order. The imposition of fines after the date of this Opinion therefore would require a future finding of contempt.[7] A new finding of contempt requires notice and a hearing. The automatic imposition of sanctions upon the required submission of statements by defendants indicating any noncompliance with the timeliness provisions of the 1996 Order would present both due process concerns and administrative difficulties.

First, the Court believes that making the fines automatic presents a due process problem. By characterizing the fines as automatic, plaintiffs essentially seek summary imposition of fines for an indirect contempt.[8] The requirement of due process prohibits summary adjudication of indirect contempts. *United Mine Workers v. Bagwell,* 512 U.S. 821, 833, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). Instead, the party charged with indirect civil contempt must receive notice and an opportunity to be heard prior to the imposition of sanctions for such conduct. *Id.* at 827, 828, 114 S.Ct. 2552; *Newton v. A.C. & S., Inc.,* 918 F.2d 1121, 1127 & n. 5 (3d Cir.1990) (explaining that notice and a hearing before the imposition of

contempt sanctions is important so that the "parties have an opportunity to explain the conduct deemed deficient ... and that a record will be available to facilitate appellate review."). Furthermore, during such civil proceedings, the party moving for contempt bears the burden of showing by clear and convincing evidence that (1) a court order was in effect, (2) the order required certain conduct by the respondent, (3) and the respondent failed to comply with the court's order. *SEC v. Bankers Alliance Corp.,* 881 F.Supp. 673, 678 (D.D.C.1995). The party facing contempt sanctions must be allowed the opportunity to raise any applicable defenses. *See Bagwell,* 512 U.S. at 827, 114 S.Ct. 2552; *Bankers Alliance Corp.,* 881 F.Supp. at 678 (noting the potential availability of an impossibility defense to a party opposing the imposition of sanctions).

In light of the foregoing, the Court concludes that the automatic imposition of fines would violate the prohibition against summary adjudication of an indirect contempt by depriving defendants of an opportunity to be heard and by eliminating the moving party's burden of demonstrating the propriety of the imposition of sanctions.

Even if no due process concerns existed, the Court would not treat the fines as automatic because of the practical difficulties which would ensue. Imposing automatic fines would shift the burden of several monitoring responsibilities from the plaintiffs and plaintiff-intervenor to the Court, *i.e.,* defendants' compliance with the Remedial Plan, defendants' submission of "automatic fines" to the Clerk's Office, and the correctness of their calculations regarding the amount of fines. If the fines were treated as automatic, the Court would be required to review all of defendants' submissions from March of 1997

comply with the purgation conditions of the Remedial Plan, and that the fines set forth in that Plan are due without the necessity for further proceedings.

**7.** Plaintiffs and plaintiff-intervenor are free to move for new findings of contempt for any contemptuous conduct occurring after the date of this Opinion. Under the Remedial Plan, as amended by Section II.A of this Opinion, discussed *infra,* each instance in which defendants are delinquent in paying provider vouchers with-

in 30 days will be considered a separate contempt, and each failure to pay the vouchers within 15 days thereafter will be considered a failure to purge the contempt.

**8.** An indirect contempt is conduct that occurs outside the presence of the court. The classic example of an indirect contempt is the failure of a party to obey a court order, such as the conduct at issue in this case.

through the present to determine the amount of sanctions due for their violations of the Remedial Plan's timeliness provisions without the benefit of briefing by the parties and analysis by the Special Master. The Court would have to undertake such a review also for the violation of other purgation conditions (such as those regarding case worker/patient ratios). Furthermore, disputes would likely arise regarding the precise amount of sanctions due even if defendants were to submit automatic fines for delinquent payments.

The Court believes that the Special Master's and parties' legitimate desire for quick resolution of motions for sanctions can be balanced with due process concerns by requiring the submission of such motions directly to the Court, which would then refer them to the Special Master for a report when some exceptional condition requires it.[9] Accordingly, the Court concludes that characterization of the fines as automatic would have little practical benefit and would tend to increase the chances of error in the assessment of fines. The Court therefore limits its imposition of fines at this time to the conduct specifically raised as the basis for the imposition of sanctions in plaintiffs' motion.[10]

### C.  Calculation of Sanctions

Plaintiffs' motion, citing defendants' sworn submissions to the Court, asserts that defendants made delinquent payments to vendors in the months of October, November, and December of 1996 and January and February of 1997. The Court adopts the Special Master's calculations in Section II.D for the number of days that defendants were delinquent in paying Medicaid vouchers and the amount of the overdue non-Medicaid vouchers for this period.[11]

Regarding the Medicaid vouchers, defendants made no overdue payments for the months of October and November. However, their payments were overdue by 13 days in December, 5 days in January, and 13 days in February, for a total of 31 days. The Remedial Plan provides that a $5,000 per diem fine shall be imposed for each voucher that is not paid within the required 30–day period. Accordingly, the Court imposes $155,000 in civil sanctions for defendants' failure to comply with the purgation conditions established by the Remedial Plan with respect to the timely payment of Medicaid vouchers for the period of October 1996 through February 1997.

Regarding the non-Medicaid vouchers, defendants made 31 late non-Medicaid payments totaling $632,312 in October, 71 late payments totaling $1,141,896 in November, 35 late payments totaling $414,534 in December, 18 late payments totaling $156,678 in January, and two late payments in February totaling $125,250. The total of the late payments during these months is $2,470,670. The Remedial Plan provides that, if defendants make late payments of non-Medicaid vouchers (i.e., more than 30 days after the submission of an acceptable voucher), defendants must pay a fine equaling twice the amount of each voucher. Accordingly, the Court imposes $4,941,340 in civil sanctions on defendants for their failure to pay non-Medicaid vouchers timely during the period October 1996 through February 1997. Therefore, for their delinquent payment of both Medicaid and non-Medicaid vouchers, defendants owe a total of $5,096,340 in civil sanctions. Defendants shall submit such funds to the Clerk of the Court within 90 days of the date of this Opinion.

9.  See Federal Rule of Civil Procedure 53(b) regarding referrals to masters. In fact, this procedure was followed with respect to the current motions.

10.  The Court notes that plaintiffs and plaintiff-intervenor are free to move for sanctions for the period of March 1997 to the date of this Opinion under the original terms of the Remedial Plan. Any contemptuous conduct occurring after the issuance of this Opinion will be subject to the terms of the Remedial Plan, as modified by this Opinion.

11.  As explained in footnote 3, the Court's calculation of fines differs from the Special Master's calculation because it bases the fines on a shorter period of contemptuous conduct beginning from the August 2, 1996, finding of contempt and tolled by plaintiffs' motion for sanctions filed on April 2, 1997. The actual calculation is based on plaintiffs' documentation of delinquent payments from October 1996 to February 1997, which plaintiffs submitted with their motion for sanctions.

II. *Modification of the Remedial Plan*

The Court adopts the Special Master's findings and conclusions regarding defendants' motion for modification of the Remedial Plan (Section III) and, accordingly, rejects defendants' motion to expand the payment period from 30 days to 45 days. The Court adopts in part, and rejects in part, the Special Master's proposed modifications of the Remedial Plan.

A. *Modification To Forgive Fines for Failure to Pay Vendors Within 30 Days When Defendants Make Payment Within 45 Days*

The Court adopts the Special Master's recommendation, with slight modification of her proposed language, that the Remedial Plan be modified to permit defendants to purge any future contempt for not paying vendors within 30 days by making payment within 45 days of submission of the vendors' vouchers.[12] *See* Section IV of the Special Master's Recommended Findings of Fact and Conclusions of Law. This modification differs from defendants' motion to modify the 30–day payment period for vendors to allow a 45–day payment period. Under the Court's modification, defendants still are required to make payment within 30 days, but if defendants make payment between the 31st day and the 45th day, defendants will have purged the *per diem* fines incurred since the 31st day and need not pay any fines. If, however, defendants do not make payment after the 45th day, the defendants will have missed their opportunity to purge their contempt, and the *per diem* fines will be assessed from the 31st day forward.

Currently, the provisions of Section I.D of the Remedial Plan articulating sanctions for untimely payments state:

Accordingly, it hereby is

ORDERED, that should defendants fail to purge their contempt by paying acceptable provider invoices within 30 days of submission, as required by this Remedial Plan, at the end of the first month in which defendants report that there are outstanding Medicaid payments due but not paid within 30 days of submission of an acceptable invoice, defendants shall be assessed a coercive civil fine of $5,000 a day, until the overdue payments are made.

\* \* \* \* \* \*

It hereby further is

ORDERED, that with respect to non-Medicaid payments found to be overdue, defendants shall be assessed a coercive civil fine of twice the amount overdue. . . .

These provisions shall be amended to read:[13]

Accordingly, it hereby is

ORDERED, that should defendants fail to pay acceptable Medicaid invoices within 30 days of their submission, as required by this Remedial Plan, defendants shall be assessed a coercive fine of $10,000 a day for each day, beginning from the 31st day, that each overdue invoice remains unpaid, except that no fines shall be assessed if payment of such acceptable Medicaid invoices is made on or before the 45th day after the submission of such invoices.

\* \* \* \* \* \*

It hereby further is

ORDERED, that should defendants fail to pay acceptable non-Medicaid invoices within 30 days of their submission, as required by this Remedial Plan, defendants shall be assessed a coercive fine of $1,000 a day for each day that each overdue invoice remains unpaid, except that no fines shall be assessed if payment of such acceptable non-Medicaid invoices is made on or before the 45th day after the submission of such invoices.

12. Defendants make the wholly unpersuasive assertion that such a modification would constitute an attempt by the Court to amend the Quick Payment Act in violation of the principle of separation of powers. The Court notes that the Special Master clearly (and correctly) stated that the Quick Payment Act does not apply to this case and that she considered it only for guidance in crafting the present modification.

13. As noted in the following section, the Court also adopts the Special Master's recommendations that the Medicaid *per diem* fine be increased and that the non-Medicaid fine be changed to a *per diem* fine.

B. *Modification of the Amount of the Medicaid Per Diem Fines and the Structure of the non-Medicaid Fines*

The Court adopts the Special Master's proposal that the fine provisions of the Remedial Plan be modified to increase the *per diem* fine for untimely Medicaid payments to $10,000 and to replace the existing sanction for non-Medicaid payments (doubling the amount of overdue payments) with a *per diem* fine of $1,000 for each overdue invoice that remains unpaid. The purpose of altering these payments is to make the fines assessed for untimely vendor payments more comparable and efficient.[14] The text of the sanctions provisions as amended appears in the preceding section.

C. *Modification of Reporting Requirements*

The Court also adopts, as modified, the Special Master's recommendation that defendants' reporting requirements be amended to reflect the preceding modification in the structure of sanctions for untimely payments. Currently, Section I.C of the Remedial Plan requires defendants to submit a sworn statement to the Court each month which includes the following information:

1. A list of care providers for the class who have not been paid full Medicaid reimbursement within 30 calendar days after the submission of their invoices to First Health or another Medicaid processing contractor. The list shall indicate for each unpaid care provider the amount of overdue payment and the number of days by which the payment is overdue.

2. A list of all other class care providers to whom payment has not been made within 30 calendar days of their submission of acceptable invoices to MRDDA, or any other agency of the District of Columbia, for services provided to plaintiffs ordered by the Court's several Consent Orders. As with requirement [1] above, the list shall contain for each care provider the amount of overdue payment and the number of days by which the payment is overdue. (A provider invoice submitted to MRDDA is "overdue" if it has not been paid within 8 working days or 15 calendar days, whichever is longer, after the DHS Controller has assigned the invoice a voucher number.)

Those provisions shall be amended to read as follows:

1. A list of care providers for the class who have not been paid full Medicaid reimbursement within 30 calendar days after the submission of their acceptable invoices to First Health or another Medicaid processing contractor. The list shall indicate for each unpaid care provider the amount of overdue payment and the number of days by which the payment is overdue. The number of days for which each payment—excluding vouchers which were paid within 45 days of submission—is overdue shall be added together by defendants and the resulting total shall be included in an easily identifiable section of defendants' submission. Defendants shall also include a clear and separate statement of any reduction (due to the payment of vouchers within 45 days of their submission since the previous month's statement to the Court) in the total number of days forming the basis for the calculation of any fines for the preceding month.

2. A list of all other class care providers to whom payment has not been made with-

---

14. The Special Master explained in her Recommended Findings of Fact and Conclusions of Law why the current system of fines creates an illogical result. "In the case of Medicaid invoices, the fines are based on the number of days of delinquency. In the case of non-Medicaid invoices, the fines are twice the amount of overdue payments reported in defendants' monthly statements to the Court.... As a result, defendants' failure to pay large amounts due on Medicaid invoices incurs modest fines of $5,000 per delinquent day regardless of the magnitude of the overdue payments. For example, $2 million in Medicaid payments ten days overdue would incur a fine of $50,000. On the other hand, failure to pay several non-Medicaid invoices can result in relatively large fines based on the amounts overdue and not on the number of days such payments are overdue. For example, three unpaid non-Medicaid invoices totaling $240,000 incur fines of $480,000 if they are one day overdue or ten days overdue, and defendants are still obligated to pay the vendors $240,000." (Recommended Findings of Fact and Conclusions of Law, at 25.)

in 30 calendar days of their submission of acceptable invoices to MRDDA, or any other agency of the District of Columbia, for services provided to plaintiffs ordered by the Court's several Consent Orders. As with requirement 1 above, the list shall contain for each care provider the amount of overdue payment and the number of days by which the payment is overdue. (A provider invoice submitted to MRDDA is "overdue" if it has not been paid within 8 working days or 15 calendar days, whichever is longer, after the DHS Controller has assigned the invoice a voucher number.) The number of days for which each payment—excluding vouchers which were paid within 45 days of their submission—is overdue shall be added together by defendants and the resulting total shall be included in an easily identifiable section of defendants' submission. Defendants shall also include a clear statement of any reduction (due to the payment of vouchers within 45 days of their submission since the previous month's statement to the Court) in the total number of days forming the basis for the calculation of any fines for the preceding month.

D. *Report by the Special Master Regarding the Disposition of the Fines and Closure*

Finally, the Court adopts, as modified, the Special Master's recommendation that the Remedial Plan be amended to require her submission of a report within a year of the date of this Opinion—developed, it is hoped, with the full cooperation of all parties—suggesting (1) constructive ways to use the fines owed by defendants and (2) steps toward ending the Court's jurisdiction over this case. Specifically, the Court directs submission of this report by November 1, 1999. The uses for the fines and the steps to be taken by the parties that would permit the Court to terminate the case should be formulated in a way that would protect the interests of the plaintiff class thereafter.

Although defendants object to use of fines owed by defendants stemming from these civil sanctions toward habilitation of the plaintiff class, the Court strongly agrees with the Special Master that such a use is not only permissible, but would be in the interest of all the parties, including defendants. Formulating a plan by means of which plaintiffs' adequate habilitation could be permanently assured would facilitate achieving the end of a case which has been before the Court for over twenty years and has considerably expended the resources and energy of all involved.

■ Furthermore, the Court finds meritless defendants' contention that requiring the Special Master to submit a report on the disposition of the fines would constitute an impermissible expansion of her authority to supervise remediation. The issuance of such a report easily falls within the "well-established tradition of allowing use of special masters to oversee compliance" with court orders. *See United States v. Microsoft Corp.*, 147 F.3d 935, 954 (D.C.Cir.1998). Such a report would merely suggest ways in which the coercive fines could be used to implement the goals of the multiple Consent Orders in this case without the continuous, direct supervision of the Court or Special Master.

Accordingly, Section IV of the Remedial Plan is amended to include the following language:

[i]t hereby is

ORDERED, that the Special Master, in cooperation and conjunction with the parties, if possible, shall develop a plan for the disposition of the fines paid by defendants which shall include suggestions for post-litigation mechanisms to ensure the protection of the plaintiff class' continuing interest in adequate habilitation following the conclusion of this lawsuit. It hereby further is

ORDERED, that the Special Master, in cooperation and conjunction with the parties, if possible, shall develop and recommend to the Court a plan for the conclusion of the above-captioned action, which shall include recommended findings of fact and conclusions of law regarding the following topics:

a. Goals. A summary and articulation of the goals of this lawsuit as reflected in

the 1978 and 1983 Consent Orders, the 1996 Remedial Plan, and all other Court-ordered obligations (hereafter collectively "Court-ordered requirements").

b. Current compliance. An evaluation of existing programs to determine the extent of defendants' compliance with requirements for the protection of the health and safety of the plaintiff class and their effectiveness in meeting the goals described in subparagraph a, including but not limited to the provision of necessary medical and other health services and the compliance of private vendors with District of Columbia licensing and payment requirements governing community residence facilities, intermediate care facilities, foster care, day treatment programs, day programs, employment programs, representative payment and guardianship.

c. Adequate habilitation. The extent of defendants' compliance with Court-ordered requirements for the provision of adequate habilitation in the least restrictive setting and their effectiveness (strengths and weaknesses) in meeting the goals described in subparagraph a, including individual habilitation planning, individual financial planning, case management, appropriate residential services, adequate habilitation services, and the safeguarding of client funds.

d. Payment of providers. The extent of defendants' compliance with Court-ordered requirements for the timely payment of private providers who provide the plaintiff class with appropriate residential services, day treatment programs, vocational and supported employment services, day programs, medical, mental health, dental, and other services required by the Court.

e. Quality assurance. The quality assurance methods to be developed and implemented by defendants to monitor continually the performance of public and private providers of service in meeting the goals of the suit.

f. Standards and compliance measurement. The standards, including outcome standards to be developed and implemented by defendants, that should be used to determine defendants' continued compliance with Court-ordered requirements, and the way in which compliance with such standards should be measured.

g. Substantial compliance standards. The degree of compliance that should be required with each of the standards recommended.

h. Permanent monitoring. The steps necessary to establish permanent, objective, efficient, and effective post-termination monitoring of the programs serving class members by independent entities (for example, private accreditation services and independent monitoring bodies).

i. Individual and community advocacy. The steps necessary to coordinate existing mechanisms and to develop needed mechanisms for the advocacy of the interests of class members, on a individual and community-wide basis, in compliance with Court-ordered requirements, including but not limited to the use of court-appointed attorneys, guardianships, and medical decision-making procedures for class members.

The Court strongly believes that development of such a plan to utilize the fines and to conclude the Court's jurisdiction over this case would serve the interests of all parties involved.

*Conclusion*

In sum, the Court imposes civil sanctions on defendants for their failure to comply with the Remedial Plan's conditions of purgation, denies defendants' motion for modification and demand for a criminal jury trial, and amends certain provisions of the Remedial Plan.