Joy EVANS, et al., Appellees,

v.

Anthony A. WILLIAMS,
et al., Appellants.

United States of America, Appellee.

No. 99–7058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 14, 2000.

Decided March 31, 2000.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, argued the cause for appellants. With him on the briefs were Robert R. Rigsby, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Melvin W. Bolden, Jr., Trial Counsel.

John L. Jacobus argued the cause for appellees Joy Evans, et al. With him on the brief were Kelly Bagby and Joseph B. Tulman. Patricia B. Millerioux entered an appearance.

Linda F. Thome, Attorney, U.S. Department of Justice, argued the cause for appellee United States of America. With her on the brief was Bill Lann Lee, Acting Assistant Attorney General.

Before: SILBERMAN, WILLIAMS, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The District of Columbia appeals from an order of the district court imposing contempt fines of $5,096,340 on it for its failure to comply with a consent decree. We agree with appellant that the fine was a criminal sanction that could not be imposed without a criminal trial; we also agree that the district court abused its discretion in refusing to modify the consent decree. We therefore reverse.

## I.

This case started back in 1976, when residents of Forest Haven, the District of Columbia's institution for the mentally retarded, brought a class action alleging a panoply of constitutional violations resulting from poor conditions at the facility. Named as defendants were the Mayor and four other District officials (collectively, the "District"), all sued in their official capacities. The United States soon intervened on the side of the plaintiffs.

In 1978, the parties agreed to a consent judgment that called for closing Forest Haven and placing its residents in "community living arrangements." Over the next few years the district court entered additional consent decrees. In 1983 it approved the order that underlies this dispute. That decree governs almost every aspect of the District's treatment of the mentally retarded. In particular, it requires the District to place specified numbers of Forest Haven residents in community institutions and to "insure that all vendors are paid for their goods and services no later than thirty days following their submission of acceptable vouchers."

By the mid–1990s, the District was confronted with financial problems of "horrendous proportions" and faced "its worst crisis in over a century." H.R.REP. No. 96, 104th Cong., 1st Sess. 4 (1995). It was running an annual deficit of over $600 million, and a congressional committee found that "[t]he District of Columbia is insolvent: The City does not have enough cash to pay all of its bills." *Id.* at 5. The District began missing some of the payment deadlines set out in the consent decree. In April 1995, on the motion of the plaintiffs, the district court issued an order to show cause why the defendants should not be held in contempt. It ultimately so held but did not impose sanctions. Instead, it appointed a special master to develop a remedial plan through which the defendants could purge themselves of contempt, and it ordered that the plan include "specific monetary penalties for noncompliance."

The special master completed her report in January 1996 and issued a supplemental report recommending prospective sanctions a few months later. The defendants objected, arguing that the prospective fines proposed were "unduly harsh and punitive" and that delays in making payments were "not due to any unwillingness to pay but due to a cash short fall." But the district court adopted the master's proposed remedial plan with only slight modi-

fications. The plan provided that whenever the defendants failed to pay an invoice within thirty days of submission a fine equal to twice the amount of the invoice would be imposed. Services provided by some of the facilities caring for the mentally retarded qualify for Medicaid reimbursement. Because the District made all Medicaid payments for each month at one time, and because the payments due to the care providers averaged approximately $2.8 million per month, a fine equal to twice the amount of any Medicaid arrearage would have been very large. The court therefore applied the doubling fines only to non-Medicaid payments. Late Medicaid payments, regardless of amount, were to result in a fine of $5,000 per day.

The District continued to miss payment deadlines, and in April 1997 the plaintiffs moved for the imposition of sanctions. While the sanctions motion was pending, the District sought to modify the consent decree so that it would require that vendors be paid within 45 days, rather than 30 days. Its motion to that effect included affidavits from the District's financial officials explaining that cash flow problems required a 45-day payment cycle. The court referred both motions to the special master.

The master concluded that the motion for sanctions was unnecessary because the remedial plans made fines automatic. She thought the fines were civil coercive sanctions, so the defendants were not entitled to the protections of criminal procedures. Although she did not formally find that circumstances had changed so as to warrant modifying the order as the defendants requested, she did recommend three changes to the schedule of sanctions which essentially, at least prospectively, gave the District the relief it sought. First, fines for missed payments would be forgiven unless the nonpayment continued until the 45th day. Second, fines for delays in non-Medicaid payments would be reduced to $1,000 per day, regardless of the amount of the payment, and third, fines for delays in Medicaid payments would be increased from $5,000 per day to $10,000 per day.

The District objected to the special master's report and demanded a jury trial. In *Evans v. Williams*, 35 F.Supp.2d 88 (D.D.C.1999), the district court adopted the special master's factual findings. Although it disagreed with the master's conclusion that the fines were automatic (noting that automatic fines would amount to summary punishment for an indirect contempt, a violation of due process), it granted the plaintiffs' motion to impose fines. The district judge agreed with the special master that the fines were civil rather than criminal. Therefore provision of criminal procedures was unwarranted, and the court rejected the District's objection that changed circumstances had made the imposition of sanctions unjust. It also adopted the special master's conclusions with respect to modification of the order and the remedial plan. But it modified the remedial plan only prospectively from the date of its decision, which was almost two years after the defendants had sought the modification.

The court ordered the District to pay $5,096,340 in fines, and the District appealed.

## II.

■ This case turns entirely on the proper characterization of the contempt fine. Was it civil or criminal? If the fine was criminal then it may be imposed only if the District's noncompliance—which the District claims was practically unavoidable—is proven beyond a reasonable doubt to be *willful*. *See United States v. Rapone*, 131 F.3d 188, 195 (D.C.Cir.1997). If it was civil the District would have had to show that compliance was impossible to avoid the sanction. Perhaps of even greater significance, if the judge's order is criminal in character (and the fine is serious), then the District is entitled to a jury trial. *See Bloom v. Illinois*, 391 U.S. 194, 198, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

■ Traditionally, whether a contempt is civil or criminal has depended on

the "character and purpose" of the sanction. A sanction is considered civil if it is "remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911). There also has been a traditional distinction between mandatory and prohibitory orders. The "paradigmatic coercive, civil contempt sanction ... involves confining a contemnor indefinitely until he complies with an affirmative command." *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). On the other hand, a fixed term of imprisonment imposed retroactively to punish an act of disobedience is criminal. This distinction has been extended to fines, so that "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order" is civil, but an unconditional fine imposed "after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id.* at 829, 114 S.Ct. 2552.

The District argues that the fines were indisputably not compensatory (a classic aspect of a civil fine), for they were paid to the court and not at all calibrated to the damage caused by the District's conduct. Moreover, the fines, according to the District, were fixed and determinate; there was no opportunity to escape their consequences by altering behavior, *i.e.*, to purge them once they were imposed. In other words, the fines were designed primarily to punish past acts rather than coerce future conduct and therefore should be thought punitive.[1]

Appellees argue instead that the fines should be seen as coercive and therefore civil in character because the schedule of prospective fines was announced in advance. The District therefore had the capacity to avoid the fines, so to speak to purge itself of contempt, by altering its conduct prior to the time the fines accrued. The United States makes a similar argument: the fines "were imposed for each day or month in which the defendants failed to comply with the 30-day payment requirement, and ended once the defendants complied with the requirement." In effect, the government would treat the defendants' contempt as one ongoing systemic problem of noncompliance with the consent decree. Each missed bill payment deadline would be another instance of the ongoing contempt. On this view the fines for missed bill payments were coercive sanctions that were imposed only so long as the defendants remained in contempt and that stopped being imposed once the defendants began to comply.

Recently the Supreme Court in *Bagwell* had occasion to struggle with the elusive distinction between civil and criminal contempt fines. In *Bagwell* a state court had imposed fines of $52 million against the United Mine Workers for repeated violations of an injunction prohibiting the union and its members from engaging in illegal picketing practices, including throwing rocks at employees and obstructing access to company facilities. The court had set forth a prospective schedule of fines, which it too had characterized as "civil and coercive," saying that payment "would only be required if it were shown the defendants disobeyed the Court's orders." *Id.* at 824, 114 S.Ct. 2552. The Supreme Court nevertheless held that the sanctions were criminal and that the union was entitled (due process) to the protections of criminal procedures.

The Supreme Court began its analysis by noting that the fines were not compensatory because they were paid to the court and not the company that was injured by the union's conduct. Then, it recognized the futility of distinguishing between

---

1. The District does not challenge the per diem fines associated with late Medicaid payments (even to the extent of raising an impossibility defense). We therefore discuss only the doubling fines associated with non-Medicaid payments.

coercing affirmative acts and punishing prohibited conduct (pointing out, for example, that "an injunction ordering the union: 'Do not strike,' would appear to be prohibitory and criminal, while an injunction ordering the union: 'Continue working,' would be mandatory and civil"). *Id.* at 835, 114 S.Ct. 2552. Nor did it attach significance to the fact that the trial court had prospectively announced a schedule of sanctions, reasoning that "the union's ability to avoid the contempt fines was indistinguishable from the ability of any ordinary citizen to avoid a criminal sanction by conforming his behavior to the law." *Id.* at 837, 114 S.Ct. 2552. It thought that the fines were most closely analogous to fixed, determinate criminal fines that the union had no chance to purge once imposed.

Appellees' and intervenor's effort to lump together each District action or inaction in a continuous course of noncompliance is inconsistent with the Supreme Court's *Bagwell* analysis. If their approach governed, the United Mine Workers' contempt would have been treated not as a series of discrete acts but as an ongoing pattern of noncompliance with the order to refrain from violence. Each fine would have been thought imposed not for a particular violent act but as additional coercion (like a per diem fine) for a continuation of the ongoing contempt. Accordingly, drawing upon *Bagwell,* it is improper to regard the District as capable of purging itself of contempt by paying a bill before the thirtieth day—it simply was not in contempt until it failed to pay on the thirtieth day. Each missed payment was a separate violation of the consent decree and a separate act of contempt. And for each act of contempt, the District was subjected to a one-time determinate fine; once it was imposed, there was no opportunity to eliminate it through future compliance. To be sure, the District could have avoided liability had it paid each bill before the thirtieth day. But as the *Bagwell* Court pointed out, this is no different from

any citizen's ability to avoid punishment by conforming his conduct to the law.

Appellees also argue that the fines are not large enough to be scrutinized under *Bagwell.*[2] They do not suggest that a fine of over $5 million is not "serious"—obviously it is. Instead, they contend that the many smaller fines that make up the $5 million should be evaluated separately. This overlooks the large size even of some of the component fines (for example, a $104,600 bill paid on the 31st day produced a $209,200 fine). More fundamentally, it is at odds with the approach taken by *Bagwell,* which considered the amount of the total fine. *See id.* at 837, 114 S.Ct. 2552 ("The fines assessed were serious, *totaling* over $52 million.") (emphasis added); *see also NOW v. Operation Rescue,* 37 F.3d 646, 660 (D.C.Cir.1994) (Aggregate fine of $193,623 was "large enough to invite our scrutiny under the principles enunciated in *Bagwell.*").

In any event, it was the nature of the injunction itself, rather than the form or amount of the fines, that appears to have been the key to the Court's determination that the contempt was criminal in character in *Bagwell.* The Court described the injunction as establishing a "detailed code of conduct," *Bagwell,* 512 U.S. at 836, 114 S.Ct. 2552, and it was that "consideration" that convinced the Court that the fines were criminal.

> The union's sanctionable conduct did not occur in the court's presence or otherwise implicate the court's ability to maintain order and adjudicate the proceedings before it. Nor did the union's contumacy involve simple, affirmative acts, such as the paradigmatic civil contempts examined in *Gompers.* Instead, the Virginia trial court levied contempt fines for widespread, ongoing, out-of-court violations of a complex injunction. In so doing, the court effectively policed petitioners' compliance with an entire

---

2. Neither the appellees nor the intervenors argue that, even if the fine is criminal, it is nevertheless "petty" and could be imposed

without a jury trial. *Cf. Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).

code of conduct that the court itself had imposed. The union's contumacy lasted many months and spanned a substantial portion of the State.

*Id.* at 837–38, 114 S.Ct. 2552.

In response to the District's claim that the order before us is just the same kind of complex injunction that was before the Court in *Bagwell,* appellees (and the intervenors) argue that we should see the consent decree as only addressing various simple discrete acts; in other words, they would disaggregate the decree. But, if anything, the decree here is more far-reaching than the *Bagwell* injunction which, after all, did not seek to control the union's business. It only prohibited violence at a strike at one company. Here, by contrast, the decree governs the administration of an entire governmental program in the District of Columbia. It prescribes a complete code of conduct—originally covering everything from bill payments to staffing to air conditioning—that the district court has enforced for years. Even the payment requirement has complex elements because the District paid over one hundred non-Medicaid providers each month.

Appellees complain that if sanctions such as these were deemed criminal and not civil, it would be difficult for the court to manage litigation seeking institutional reform. That may well be so. Giving alleged wrongdoers the benefit of a hearing before a neutral factfinder—particularly a jury—is always in some sense an impediment to judicial power. And it is not surprising that district courts around the country, reluctant to surrender part of their power to coerce obedience to their decrees, have resisted the logic of *Bagwell.*[3] But as the Supreme Court noted,

there are countervailing considerations. When a district judge assumes the responsibility to regulate the activities of a large institution and then seeks to identify and punish violators of his or her injunction, he or she comes perilously close to fusing the powers which our Constitution separates. *See Bagwell,* 512 U.S. at 831, 114 S.Ct. 2552 ("Unlike most areas of law, … civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct."). The Court was not unaware that its decision would lay "burdens on courts' ability to sanction widespread, indirect contempts of complex injunctions," *id.* at 838, 114 S.Ct. 2552— nor are we. Because the defendants were not given the benefit of criminal procedures, the order imposing the fine must be reversed.[4]

### III.

■ There remains the propriety of the district court's refusal to modify the consent decree. The practical consequence of this issue has been somewhat attenuated by the special master's decision to modify the fine structure, but the question remains relevant because the fines were modified only prospectively. The District still faces the possibility of being fined for late payments made between April 1997 (when it made the motion to modify) and February 1999 (when the fine schedule was modified).

■ Federal Rule of Civil Procedure 60(b)(5) permits a court to modify a judgment or order when "it is no longer equitable that the judgment should have prospective application." Appellant argues that under *Rufo v. Inmates of the Suffolk*

---

3. *See, e.g., Crowe v. Smith,* 151 F.3d 217, 221 (5th Cir.1998) (reversing order "imposing serious criminal sanctions … via a manifestly civil process"); *Mackler Productions, Inc. v. Cohen,* 146 F.3d 126 (2d Cir.1998) (reversing a $10,000 punitive fine imposed without criminal procedures); *Law v. NCAA,* 134 F.3d 1025 (10th Cir.1998) (reversing retroactively imposed per diem fines); *In re E.I. DuPont De Nemours & Co.–Benlate Litigation,* 99 F.3d

363 (11th Cir.1996) (reversing an over $13,-000,000 punitive fine imposed without criminal procedures).

4. Because we have determined that the District must be given a criminal trial, we do not address the argument that the district court abused its discretion in refusing to consider the defense of impossibility.

*County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the district court should have granted its motion to modify. *Rufo* held that the party seeking a modification need not make a "clear showing of grievous wrong evoked by new and unforeseen conditions"—a standard that had been applied since *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 76 L.Ed. 999 (1932). It pointed out that flexibility is especially important in institutional reform litigation: "Because [consent] decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Rufo,* 502 U.S. at 380, 112 S.Ct. 748. In particular, "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." *Id.* at 384, 112 S.Ct. 748. While a modification should not be granted because of "events that actually were anticipated" by the parties, the party seeking a modification need not show that the changed circumstances were unforeseeable. *Id.*

To decide whether the District's financial problems were a changed circumstance, we first must answer the antecedent question: changed relative to when? The District looks to the 1983 consent decree, the appellees and the United States to the 1996 remedial plan. But the 1996 remedial plan was designed simply to implement the consent decree and to address the district's failure to make payments in accordance with it. The substantive obligations imposed on the district all stem from the 1983 decree. Our focus might be different if the remedial plan had been based on a comprehensive reexamination of the obligations in the 1983 decree. In that case, it might be thought that the District was obliged to make its claim of financial hardship then. But the aims of the remedial plan were more modest: the judge explained that its purpose was simply "to bring the District into compliance with its outstanding obligations." It is true that the judge also invited the parties to seek appropriate modifications of the consent decree in light of changed circumstances. But even though the District did not in so many words request relief from the 30-day payment requirement, it did object (repeatedly) to being sanctioned for late payments, explaining that it expected to be unable to pay on time. In any event, the parties do not appear to have regarded the remedial plan as a complete solution to all of the problems that had arisen under the consent decree. They thought that the District's financial difficulties still might require a future solution. The special master noted that the possibility of further modifications had been discussed, and the judge observed that the District was in a time of "transition" and its ability to make timely payments might be contingent on the actions of Congress. We therefore think we must look at whether circumstances have changed since 1983 rather than at whether they have altered only in the last few years.

The District makes the obvious point that no one in 1983 anticipated the District's insolvency or its crushing debt burden. And as *Rufo* explained, "[f]inancial constraints may not be used to justify the creation or perpetuation of constitutional violations, but they are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification." *Id.* at 392–93, 112 S.Ct. 748. Appellees respond that although this particular financial crisis was not contemplated, the parties certainly had in mind the District's generic inability or refusal to pay the vendors—that was the very reason the 30-day requirement was part of the consent decree. But *Rufo's* modification standard does not require absolute unforeseeability. It is enough that the parties did not actually contemplate the changed circumstances. And the crisis of the 1990s was different in kind rather than degree. Moreover, the 30-day payment requirement likely was intended to protect the class members against bureaucratic neglect, not against the District's near-bankruptcy. In truth, the consent

decree was negotiated with the expectation that the District would be able to pay its bills. Once it could not, circumstances had changed.

The appellees contend that even with the District's financial problems, a 30–day payment schedule is not unreasonable or onerous. But the District submitted affidavits to the contrary, and the district court seems at least implicitly to have resolved this question in its favor, for the effect of its ruling is to give the District the benefit of a 45–day payment schedule, albeit only after February 1999. The judge offered no reason why the District's relief from fines should not extend to the point at which it made the motion—nor can we think of one.

We do not of course suggest that a party may be relieved from the obligation to comply with an injunction simply by making a motion for a modification. But here the District claimed that it could not comply, despite making a good faith effort to do so. If true, this should have relieved it from liability. *See Tinsley v. Mitchell*, 804 F.2d 1254, 1256 (D.C.Cir.1986) ("If a party lacks the financial ability to comply with an order, the court cannot hold him in contempt for failing to obey."). And the district court did not find that the District's claim was wrong. Instead, it adopted the master's report which simply pointed out that the District's financial situation was no worse than at the time the remedial plan was adopted in 1996—a fact that as we have explained is not relevant.

Nor is the United States correct when it invokes the collateral bar rule of *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). *Walker* provides that the invalidity of an injunction is not a defense to contempt, so that a party faced with an invalid injunction must have the injunction modified or vacated; he cannot simply ignore it. The theory behind that rule is rather obvious, but it does not extend to cases where a party is faced with an injunction with which it is unable to comply. *Walker* cannot justify subjecting the District to liability for the period in which the district court was considering the modification motion.

We conclude that it was an abuse of discretion for the district court not to grant the District's motion retroactive to the time at which it was made.

\* \* \*

The order of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*