ROGERS, Circuit Judge,
concurring in part and dissenting in part.
The history of this litigation bears witness to the many obstacles to relief for the class of African American farmers covered by a consent decree based on their allegations of unlawful racial discrimination by the United States Department of Agriculture in administering its farm loan programs. The task has not been easy for a number of reasons, including the complications necessarily associated with ensuring relief to eligible class members and the deficiencies of class counsel, as determined by the district court. While the district court’s efforts so far have ensured that only a small portion of the class will not have them claims for Monitor review considered, as a result of the court’s decision today, the claims of 305 class members are unduly extinguished: 97 farmers will lose the opportunity to have independent administrative review of their claims by a Monitor in accordance with the claims procedure in the consent decree, and 208 farmers (170 without counsel), who may not have received notice of the filing deadlines, will lose their opportunity to pursue their claims at all.
In denying appellants’ motion of July 19, 2002 for relief for these 305 class members, and the motions for reconsideration of June 13 & 16, 2003, the district court clearly erred in relying on a finding of fact regarding the increased claims workload, and erred, alternatively, as a matter of law by faffing to consider, in accordance with Pigford v. Venenan, 292 F.3d 918 (D.C.Cir.2002) (“Pigford I ”), whether class counsel’s untimely filings was a changed circumstance within the meaning of Federal Rule of Civil Procedure 60(b)(5). It also erred by l failing to inquire whether 208 claimants’ late filings were due to the inadequacy of the notice procedures before determining whether to deny any relief under Federal Rule of Civil Procedure 6(b). Accordingly, while I concur in the holding that the July 14, 2000 Order establishing the original filing deadlines was a final appealable order, see Op. at 17, I would reverse and remand the case to the district court to determine whether the filing deadlines were “unworkable,” and thus warranting relief for 97 class members pursuant to Rule 60(b)(5), and to determine whether 208 class members failed to receive notice of the filing deadlines as a result of inadequate notice procedures and were entitled to relief under Rule 6(b).
I.
The question on appeal is whether the district court abused its discretion in deny *23 ing appellants’ motions for an extension of the filing deadlines, and for reconsideration under Rule 60(b). Evans v. Williams, 206 F.3d 1292, 1299 (D.C.Cir.2000); Peters v. Nat’l R.R. Passenger Corp., 966 F.2d 1483, 1485 (D.C.Cir.1992). While our review is deferential, an abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, fails to consider a relevant factor, or applies the wrong legal standard. See In re Vitamins Antitrust Class Actions, 327 F.3d 1207, 1209 (D.C.Cir.2003); Evans, 206 F.3d at 1298; Marina Mgmt. Servs. Inc. v. Vessel My Girls, 202 F.3d 315, 321 (D.C.Cir.2000); see also Kickapoo Tribe of Indians v. Babbitt, 43 F.3d 1491, 1497 (D.C.Cir.1995).
Rule 60(b)(5) provides, in relevant part, that “the court may relieve a party ... from a final judgment, order or proceeding [if] ... it is no longer equitable that the judgment should have prospective application.” Fed.R.Civ.P. 60(b)(5). A movant under Rule 60(b)(5) must demonstrate “changed circumstances” since the entry of the judgment from which relief is sought. Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 383, 385, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Such change need not be “unforeseeable, but only unforeseen.” Id. at 385, 112 S.Ct. 748. The Supreme Court in Rufo explained,
Ordinarily ... modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree, [citations omitted] If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).
Id. In Pigford I, the court held that changed circumstances may include “unforeseen obstacles” that make an order “unworkable.” Pigford I, 292 F.3d at 925; see Rufo, 502 U.S. at 384, 112 S.Ct. 748.
The district court found that the large increase in the number of claimants occurred before the deadlines in the July 14th Order were agreed to, and therefore did not amount to unanticipated “changed circumstances” rendering the deadlines “unworkable” within the meaning of Rule 60(b)(5). See Pigford v. Veneman, 265 F.Supp.2d 41, 47 (D.D.C.2003), reconsideration denied, Pigford v. Veneman, 307 F.Supp.2d 43 (D.D.C.2004). In so finding the district court, as does the court today, Op. at 19 - 20, ignored the key distinction argued by appellants in their motion for reconsideration and supported by evidence in the record. Appellants pointed out that the critical “changed circumstance” was not the vastly greater number of total claimants, but the unanticipated large number of claimants seeking Monitor review because their claims likely had been denied erroneously in the first instance by the adjudicator, and had potentially meritorious grounds for seeking Monitor review. Appellants explained that class counsel originally had anticipated that the vast majority of would-be seekers of Monitor review would not meet the high standards for such review set forth in the consent decree — “clear and manifest error” that is “likely to result in a fundamental miscarriage of justice,” Consent Decree ¶ 12(b)(iii) — and therefore, at the time they agreed to the July 14th Order deadlines, had estimated that only approximately 2,500 petitions would require processing for Monitor review. However, class counsel subsequently discovered that a much higher number of the claims rejected by the adjudicator were potentially meritorious claims even under the high standard for Monitor review. In fact, the total vol *24 ume of claims actually processed for Monitor review was much higher than 2,500: Class counsel and the of-counsel law firm Chestnut, Sanders ended up processing 3,700 Track A requests for Monitor review, with other firms processing other, smaller numbers of requests.
In support of this distinction, appellants pointed to the high success rates of claims upon Monitor review: The facilitator’s report cited by appellants indicated that approximately 48% of the claimants who had filed for review with the assistance of counsel had been approved by the Monitor for reexamination by the adjudicator, and 100% of reexamined petitions prevailed on the merits. This statistical evidence substantiated class counsel’s argument that many meritorious claims had been erroneously denied by the adjudicator, necessitating the filing of petitions for Monitor review and creating more work for class counsel than was anticipated when the July 14th Order deadlines were agreed to.
The record further indicates that the number of class members seeking Monitor review was unanticipated by either party or by the district court when the parties agreed to those deadlines. As noted, when the district court established the Register of Petitions process in the November 11, 2000 Order, class counsel was estimating a total of 2,500 petitions for Monitor review. The district court relied on this estimate to set the filing schedule for fully supported petitions. The November 11th Order further indicated that the higher volume of petitions for Monitor review was not anticipated, for the district court acknowledged that neither the Department nor the Monitor were prepared to handle and process the higher volume of petitions. The court stated:
It is obvious that if Class Counsel, Of Counsel and all unaffiliated counsel were forced to file thousands of fully supported Petitions by November 13, the government would be unable to respond to them in a meaningful way within the 60 days that it has to file a response, [citation omitted] Furthermore, the Monitor informed the Court at the hearing that even if the government had the resources to complete such a task, the Monitor initially will be unable to decide the Petitions at a pace greater than 200 to 300 each month.
Indeed, the district court later acknowledged at the April 19, 2001 status conference that “some of the failings of the lawyers, if we want to call them that, are simply because people were overworked. There was much more to be done than people thought.” (emphasis added).
In light of the record evidence that the high number of class members seeking Monitor review was unanticipated at the time the July 14th Order deadlines were agreed to, the district court clearly erred in relying on its finding in its opinion of June 2, 2003 that the “critical ‘changed circumstance’ ” had “occurred before, not after, the relevant deadlines were agreed to,” in denying appellants’ motion for reconsideration in its opinion of March 19, 2004, Pigford, 307 F.Supp.2d at 48, without distinguishing between the overall number of claimants and the number of petitions for Monitor review. Instead, the district court denied reconsideration stating that, notwithstanding appellants’ “further elaboration,” “the [c]ourt declines to revisit its determination that the asserted ‘changed circumstances’ presented by [appellants] do not justify modification of the [c]ourt’s prior orders under Rule 60(b)(5).” Id. While the court states that the district court established the Register procedure to provide relief from the increased volume of meritorious petitions, Op. at 19, that relief created filing problems of its own and, in any event, the district court underestimated the volume of Monitor-review petitions even then.
*25 Moreover, in denying appellants’ motions, the district court failed to consider the instruction of Pigford I that where class members lack competent counsel, counsel’s failure to meet deadlines itself may amount to an “unforeseen obstacle” that makes the decree “unworkable” under Rule 60(b)(5). Pigford I, 292 F.3d at 925. In Pigford I, this court embraced the concept that the district court has a duty to protect class members where such members did not choose their counsel and where retention of other lawyers is unlikely, 292 F.3d at 926-27, a concept embraced by other circuits as well.[1] Noting that the consent “decree’s express purpose is to ‘ensur[e] that in their dealings with [the Department], all class members receive full and fair treatment,’ Consent Decree at 2, and its ‘main accomplishment was the establishment of a process to adjudicate individual claims,’ ” this court distinguished between the fadings of class counsel and the opportunity of class members to avail themselves of the remedial scheme under the consent decree: The court opined that there was “no basis for holding [the class members] responsible for [counsel’s] failure” to meet deadlines which had been bargained for by the parties, Pigford I, 292 F.3d at 927, and held that relief was appropriate under Rule 60(b)(5) because “class counsel’s failure to meet critical Track B deadlines amounts to an ‘unforeseen obstacle’ that makes the decree ‘unworkable,’ ” id. at 927 (quoting Rufo, 502 U.S. at 384,112 S.Ct. 748).
This conclusion in Pigford I is no less applicable now than it was then, for “[t]o hold otherwise would sanction the farmers’ double betrayal: first by the Department ... and then by their own lawyers.” Id. In granting an extension of Track B deadlines missed due to attorney error, the district court had previously acknowledged that the general rule that attorney error is not excusable should not apply here, where “[t]he history of this case is unique ... and requires more than hasty application of general practice.” Pigford v. Veneman, 182 F.Supp.2d 50, 52 (D.D.C.2002). This court observed in Pigford I that,
[T]he decree itself assumes competent representation for the farmers. The decree’s express purpose is to “ensur[e] that in their dealings with [the Department], all class members receive full and fair treatment,” ... and its “main accomplishment was the establishment of a process to adjudicate individual claims.” ... Unless the farmers have competent counsel, we cannot imagine how they could ever obtain “full and fair treatment” in a claims process where ... missing a single deadline could be fatal.
292 F.3d at 927 (quoting Consent Decree, at 2; Pigford v. Glickman, No. 97cv01978 (D.D.C. Mar. 8, 2001)). Not only has the district court found class counsel’s performance sanctionable and imposed severe monetary fines on them, Pigford v. Veneman, 307 F.Supp.2d 51 (D.D.C.2004), but at a time when there was, as the district court stated, “much more to be done than people thought,” and the critical filing deadlines were drawing near, class counsel *26 and of-counsel were in dire financial straits as a result of the lack of payment of interim fees by the government, as appellants reminded the district court in their motion for reconsideration.[2] The district court recognized at a status conference held on April T9, 2001 that the delay in awarding interim fees
had an impact on the number of lawyers and the amount of time that those lawyers are spending on the Monitor petition process.... if you have to succeed or prevail to get paid, then getting new lawyers in the act would be hard, and I understand that it is also having an impact on the existing lawyers. [Class counsel] has cut back on [its] staff,
(emphasis added).
Today, by affirming the denial of appellants’ motions, the court ignores our analysis in Pigford I and the duty of the trial judge to protect class members who do not chose their own counsel when unanticipated circumstances have created “a situation where there were too many cases and too few lawyers.” Br. for Appellants at 22. By declining to account for Pigford I’s contrary holding as an infringement of the district court’s discretion, Op. at 20, the court ignores that Pigford I involved the same unique history, the same consent decree, the same class counsel, and the same issue of modification of deadlines missed by class counsel under Federal Rule of Civil Procedure 60(b)(5) considered in the same court, and as such its holding is nearly akin to the law of the case, in addition to being law of the circuit. See LaShawn A. v. Barry, 87 F.3d 1389, 1393, 1395 (D.C.Cir.1996) (en banc). That Pig-ford I involved claims under Track B rather than Track A does not change the fact that the legal issue before the court is the same: whether appellants are entitled to relief under Rule 60(b)(5) for counsel’s fail *27 ures to meet filing deadlines. See Op. at 19-20. While the court points out that Pigford I acknowledged “the presumption of client accountability for attorney conduct,” id., it ignores that Pigford I also found this presumption overcome because class counsel was not freely chosen by class members and the circumstances of the case, together with the terms of the decree, made retention of other lawyers “unlikely.” Pigford I, 292 F.3d at 926. Here, the very same circumstances remain, and were further exacerbated by additional unanticipated circumstances which created “a situation where there were too many cases and too few lawyers.” Br. for Appellants at 22. This court cannot avoid, by pointing to “a different procedural posture,” Op. at 19, that the district court is bound, under Pigford I, see LaShawn A, 87 F.3d at 1393, 1395, to separate class counsel’s failings from the claims of the class members, particularly in light of the district court’s affirmative duty to “renew its stringent examination of the adequacy of class representation throughout the entire course of the litigation,” In re Fine Paper Antitrust Litigation, 617 F.2d 22, 27 (3d Cir.1980), and that the district court’s failure to do so is an abuse of discretion, Evans, 206 F.3d at 1298.
Finally, while the Secretary would distinguish Pigford I as concerned with extinguishing a class member’s claim, see Pig-ford I, 292 F.3d at 922, from the denial of an opportunity to seek Monitor review, from the perspective of the class member whose claim has been wrongfully denied, the effect is the same: Neither class member will have the opportunity to utilize the remedial process established in the consent decree. Taken together, the circumstances identified in appellants’ motions suggest that the 97 class members should not bear the burden of counsel’s failures to meet filing deadlines. In order to avoid a “double betrayal” of the class members, the district court was required to separate the failures of counsel from the claims of the class members in order to ensure that the opportunity to pursue the claims process established in the consent decree not be foreclosed. Id. at 927. It did not do so, and the court today fails to explain how the district court fulfilled its responsibilities in accordance with the analysis in Pigford I.
Because the district court, in denying the motion for reconsideration, erroneously relied on its finding in its opinion of June 2, 2003 that the “critical changed circumstance” occurred before the July 14th Order deadlines were agreed to without taking. into account record evidence demonstrating that the volume of petitions for Monitor review — the relevant change in circumstance — was not anticipated at the time the deadlines were agreed to, and in the alternative erred as a matter of law by failing to consider whether class counsel’s failures to meet the deadlines amounted to an “unforeseen obstacle” warranting relief, I would reverse and remand the case to the district court to address whether the deadlines were “unworkable” under Rule 60(b)(5).
II.
Additionally, the district court failed to inquire whether adequate notice was provided to 208 class members, for whom appellants proffered evidence that these class members had not received notice of the filing deadlines for Monitor review, in determining whether relief was warranted under the “excusable neglect” standard of Federal Rule of Civil Procedure 6(b).
The July 14 Order modified the consent decree to limit the period within which class members could seek Monitor review of denied claims and, as the district court noted, it did not provide for individual notice to unsuccessful Track A class mem *28 bers. Instead, the July 14th Order required only that a copy of it be (1) posted in every USDA Farm Services Agency county office, and (2) sent by the facilitator to those persons who requested a claim sheet and election form. According to the Monitor’s Report, “few people eligible to file a petition with the Monitor would have received direct notice of the 120-day deadline from the mailing,” and many claimants would not see a posting in a USDA Farm Services Agency county office. See Monitor’s Report to the Court Regarding Notice to the Class of the 120-Day Deadline to File a Petition for Monitor Review (May 30, 2003). The Monitor attempted to remedy the situation by mailing additional notices to farmers who had either requested or made telephonic inquiries regarding claim forms. Still, appellants proffered evidence that 208 class members had received no notice of the filing deadlines. See, e.g., Joint Appendix at 186; 218-233, 248, 254, 256, 258, 265, 268, 269, 286, 321; id. at 423.
Nonetheless, the district court denied relief under the “excusable neglect” standard of Rule 6(b). Applying the four-factor test of Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P’ship, 507 U.S. 380, 398-99,113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the district court found first, that the government would be “prejudiced to the tune of almost one million dollars” by allowing consideration of late petitions if five percent were successful, and second, that “because the [July 14th Order] deadlines were negotiated and agreed to by the [appellants], it logically follows that the resulting failure to meet those deadlines had been within the reasonable control of [appellants].” Each finding is problematic given the district court’s duty to ensure that adequate notice procedures were, in fact, established to provide class members with notice of filing deadlines. The district court made no finding that appellants were not proceeding in good faith or that there would be undue delay of the proceedings by granting relief.
The district court’s finding of “prejudice” to the government is ironic. See Pigford v. Glickman, 185 F.R.D. 82, 95 (D.D.C.1999); see also Pigford I, 292 F.3d at 927. In approving the consent decree, the district court observed that “the settlement is a fair resolution of the claims brought in this case and a good first step towards assuring that the kind of discrimination that has been visited on African American farmers since Reconstruction will not continue into the next century.” Pigford, 185 F.R.D. at 86 (emphasis added). The July 14th Order deadlines were not imposed in order to limit the government’s liability as such, but rather, according to the district court, to bring closure to the process through fair procedures that would identify the number of class members seeking Monitor review. Moreover, the dollar amount of prejudice claimed by the Secretary represents 0.04% of the estimated settlement, see Pigford, 206 F.3d at 1244, and 0.125% of the amount actual paid out by the government at that time. This court, in turn, mistakenly relies on the Secretary’s argument that class counsel’s agreement that the July 14th Order deadlines would not be extended was the quid pro quo for its agreement to admit other Track A claimants into the class who would otherwise have been excluded. See Op. at 21 - 22; Br. for the Appellee at 24. This is not the analysis adopted by the district court in denying appellants’ motions; instead, the district court addressed that quid pro quo in imposing monetary sanctions on class counsel in a separate order, see Pigford v. Veneman, 144 F.Supp.2d 16, 19 n. 2 (D.D.C.2001), which is not on appeal.
The district court’s second finding, that the failure to meet the deadlines was within the farmers’ control because they *29 agreed to the July 14th Order deadlines, is clearly erroneous because it ignored the threshold question of whether the agreed-to notice provisions ensured that adequate notice would be provided to class members, many proceeding pro se, whose claims had been denied by the adjudicator. The fact that class counsel agreed to the notice procedures did not discharge the district court’s obligation to ensure notice was directed in a reasonable manner. Cf. Fed.R.Civ.P. 23(e)(1)(B); Doe v. Lexington-Fayette Urban County Gov’t, 407 F.3d 755, 761 (3d Cir.2005); Pigford I, 292 F.3d at 926 (citing Fed.R.Civ.P. 23(a)(4)). Once the Monitor determined that the notice procedures were inadequate and appellants proffered evidence that 208 class members claimed not to have received notice, the district court had a duty to inquire whether the notice procedures were adequate in fact. In an analogous context, the Second Circuit pointed out that the district court has “the inherent power and duty to protect unnamed, but interested persons,” Zients v. LaMorte, 459 F.2d 628, 630 (2d Cir.1972), and although the notice procedures in the settlement agreement were complied with, the Second Circuit reversed the exclusion of claims filed late due to the lack of actual notice, id. As the Third Circuit observed, the district court’s equitable powers under Rule 23 “are retained by the court until the settlement fund is actually distributed.” In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 321 (3d Cir.2001).
Whether the prejudice to the government outweighed other considerations could not be determined by the district court until it first determined — in light of the proffered evidence that the agreed-to notice procedures were inadequate for 208 class members — the adequacy of the agreed-to notice procedures, and whether the late filings were the result of inadequate notice. Only then could the district court determine whether the 208 class members were entitled to -relief under Rule 6(b). Therefore, I would reverse and remand the case for the district court to determine the adequacy of the notice procedures and whether the 208 class members were entitled to relief. See Pigford I, 292 F.3d at 925-27; In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d at 321-29; Zients, 459 F.2d at 630.
Accordingly, I respectfully dissent from Part II of the court’s opinion.

. See In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 932 (8th Cir.2005) (citing Fed.R.Civ.P. 23(e)); In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 321 (3d Cir.2001); In re Fine Paper Antitrust Litig., 617 F.2d 22, 27 (3d Cir.1980); Zients v. LaMorte, 459 F.2d 628, 629-30 (2d Cir.1972); see also In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir.2005); Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 280-81 (7th Cir.2002); Gonzales v. Cassidy, 474 F.2d 67, 75 (5th Cir.1973). While the district court noted that these cases involved earlier stages of class action proceedings, it failed to articulate any reason why this principle would not apply at the remedial stages of class action proceedings. See Pigford, 307 F.Supp.2d 43, 50 (D.D.C.2004).

. Six months before the November filing deadline, the motion of May 8, 2000 for an interim award of attorneys’ fees, costs and expert fees filed by class counsel and certain of-counsel stated:
It is now nearly three years since this case began. During this time the firms incurred crushing expense. For example, [class counsel] Conlon, Frantz incurred substantial obligations — borrowing $1,000,000 simply to remain solvent. Mr. Pires was not paid for over 15 months. He obtained multiple mortgages to pay his personal expenses .... [The Of-counsel law firm of] Chestnut, Sanders was forced by the scope of the litigation to borrow $1 million, hire new employees and cut partner salaries by 60%.
On August 4, 2000, the district court, acknowledging "the dire financial straits in which several firms affiliated with class counsel currently find themselves,” ordered an immediate preliminary award to counsel of $7 million, which covered only previously incurred costs and amounted to less than one-half the cumulative loadstar amount of $14,582,703. Although, in response to class counsel’s motion for an extension of the July 14th Order deadlines, the district court set up the Register of Petitions process in November 2000, counsel still missed filing deadlines. When the parties’ attempt, at the district court's suggestion, to resolve their differences regarding counsel's May 8th request fees and costs proved unsuccessful, on January 12, 2001 class counsel, of-counsel, and one counsel moved for additional interim fees alleging "significant hardship” as a result of continued financing of implementation of the Consent Decree, without the regular payment of fees, through bank loans to cover staff salaries and expenses. A further payment of interim fees and costs was ordered on March 8, 2001, well after the filing deadlines, and still, because of the government’s resistence, class counsel did not receive any payment until July 2001, of $14.9 million, see Pigford v. Veneman, 369 F.3d 545 (D.C.Cir.2004); a further payment of $500,000 was ordered on December 2, 2002, Pigford v. Veneman, 239 F.Supp.2d 68, 71 (D.D.C.2003). The delay in approving payment and the delay in actual receipt of interim fees by class counsel are ignored by the court in discussing the district court's "repeated accommodation of class counsel's continuing delinquency.” Op. at 19.